Celia **GERT** individually and on Behalf of the certified class, Plaintiff-Appellant,

v.

**ELGIN NATIONAL INDUSTRIES, INC.,** a Delaware corporation, et al., Defendants-Appellees.

No. 84–1276.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1985.

Decided Sept. 12, 1985.

Abraham N. Goldman, Abraham N. Goldman & Assoc. Ltd., Chicago, Ill., for plaintiff-appellant.

Richard Wasserman, Stuart, Zavin, Sinnreich & Wasserman, New York City, for defendants-appellees.

Before CUDAHY and ESCHBACH, Circuit Judges, and BROWN, Senior District Judge.*

CUDAHY, Circuit Judge.

On February 5, 1975, South Bay Corporation ("South Bay") made a tender offer to buy back its own stock at $22.07 a share. At the time, defendant Utilities and Industries Corporation ("U & I") owned 46% of the stock of South Bay; after the buy back, its share jumped to 83%.

South Bay in turn owned 20% (226,500 shares) of the stock in defendant Elgin National Industries ("Elgin"), which it valued at the market price of $7 a share at the time of the tender offer. Later in 1975 South Bay was liquidated and its cash and assets were distributed among its remaining shareholders. U & I received 199,004 shares of Elgin stock in the transaction.

Defendant Arthur Carter was, at the time of the South Bay tender offer, the President and a director of U & I, and owned 30% of its common stock. He was also a director of South Bay and of Elgin. The remaining individual defendants were at that time officers or directors of Elgin or U & I or both.

On June 17, 1975, U & I arranged a private purchase of 57,000 shares of Elgin stock, at about $15 a share. In March of 1976, Elgin made a tender offer for its own shares at $27.50 a share; later in the month the offer was increased to $32.50 a share. The defendants, other than Elgin, apparently sold their Elgin stock in 1977 and 1978 at a profit.

Celia Gert is a former stockholder in Elgin who sold her shares in March of 1976, before the Elgin buy-back was announced, at $28.50 a share. Mrs. Gert brought this suit in federal court under section 10b of the Securities Act of 1934, 15

---

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

U.S.C. § 78j, and Rule 10(b)–5, 17 C.F.R. § 240.10b–5, claiming that the defendants conspired to depress the market price for Elgin stock to allow U & I and the individual defendants to buy Elgin stock at the lowest possible prices. To that end, she claims, they suppressed information that would have raised the price of Elgin, and as a consequence she sold her shares for less than she should have received. The district court granted summary judgment for the defendants, finding that Mrs. Gert could not establish scienter—here, the intent to deceive—since Elgin had made numerous optimistic reports, disclosing the very information that Mrs. Gert claims was withheld. Since the only evidence of scienter introduced by Mrs. Gert consisted in the alleged suppression of information, and since we agree with the district court that an intent to deceive could not be demonstrated in the face of the optimistic disclosures the defendants did make, we affirm the grant of summary judgment.

## I.

In Mrs. Gert's view, the defendants were involved in a complex scheme which began on February 5, 1975, when South Bay made the offer to repurchase its own stock, and ended on March 8, 1976, when defendant Elgin, in offering to repurchase its own stock, issued a prospectus which Mrs. Gert concedes to have been truthful.[1] From the February 5 South Bay tender offer until just before the Elgin tender offer on March 8 of the next year, Mrs. Gert claims, Elgin, U & I and the individual defendants withheld good news of Elgin's increasing profitability and falsely depicted Elgin as about to enter into an essentially unfavorable merger, all with an eye toward allowing U

& I and the individual defendants to buy into Elgin at "bargain-basement" prices.

At the time Elgin was a corporation with two main concerns, the consumer products division, producer of the well-known Elgin watches, and the Engineering Group, a collection of companies involved in the production of coal processing equipment. In the early seventies the corporation had evidently been close to bankruptcy. As the decade progressed the oil shortage tended to brighten the outlook of all businesses involved in the production of the alternative fuel, coal, and Elgin's outlook improved accordingly. As a result, the other defendants apparently sold their Elgin stock in 1977 and 1978 at considerable profits. Mrs. Gert sold her Elgin stock on March 4, 1976 at a price which reflected a substantial increase in the market value of Elgin, but which she claims to have been below the true value of the stock.

For our purposes, an outline of the scheme Mrs. Gert alleges will suffice:

On February 5, 1975, South Bay made the offer to repurchase its own stock. In the prospectus South Bay indicated that the Elgin stock it held had a market value of seven dollars a share, and it also announced that Elgin was considering a one for one consolidation with U & I.[2] As Mrs. Gert sees it, the defendants were aware of recent events that would, if generally known, have increased the market value of Elgin stock, but the tender offer gave no indication that the market value was anything other than what it ought to be. For example, the defendants were aware of a greatly increased backlog of uncompleted contracts held by the Engineering Group, an increase which—in the light of a trend

---

1. See Gert's Amended Complaint:

¶ 18.A.

   (i) [The March 8 tender offer] for the first time made numerous disclosures which had theretofore been omitted and concealed by defendants in order to depress the price of Elgin common stock, said disclosures being made on March 8, 1976 inasmuch as it was no longer desired by defendants to depress the price of Elgin common stock.

¶ 23.

... [T]he tender offer of March 8, 1976 did in fact disclose the true and favorable state of affairs as to Elgin and caused thereafter the substantial increase in market value of Elgin as set out herein.

2. That is, shareholders of both Elgin and U & I would receive one share of stock in the resulting corporation for each share held in Elgin or U & I—an arrangement that, *ceteris paribus,* is fair if shares in the two existing corporations are worth roughly the same.

toward cost-plus rather than fixed cost contracts—suggested a general increase in profitability.[3] In these circumstances, according to Mrs. Gert, to simply state the market price, a price which Mrs. Gert does not dispute, is to mislead.

The announcement of the consolidation is also supposed to have been misleading. The book value of U & I stock was much less than that of Elgin stock, according to Mrs. Gert, and so news of such a consolidation would cause the value of Elgin stock to fall. She does not claim that the announcement was false, but only that it was made knowing it would depress the price of the Elgin stock.[4]

After the South Bay tender offer, Mrs. Gert contends, the defendants repeatedly failed to announce the increase in backlogs and the change to cost-plus contracts, and they continued to promote the illusion that there would be a consolidation—first at one for one, later at one for 1.2—between Elgin and U & I; and when such a consolidation became implausible, the defendants said that it had been "indefinitely postponed" instead of admitting that it had been "cancelled."

Mrs. Gert's argument to this court is not that these things are substantive violations of 10b–5, a question not up to us to decide on this appeal, but only that they are evidence of scienter—the intention, in this case, to deceive—and at least raise a question of fact sufficient to show that summary judgment was improper.

Apart from the claim that the announcement of the consolidation was misleading, what Mrs. Gert argues has to do with a failure to disclose.

## II.

■ When a private plaintiff (rather than the SEC) brings suit under section 10(b) of the Securities Exchange Act of 1934 and rule 10b–5, he must prove scienter; that is, he must show either an intent to defraud or recklessness. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1043–45 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). Mrs. Gert alleges an intent to defraud. The district court granted the defendants summary judgment because it found that, as a matter of law, the evidence was insufficient to support a finding of such an intent. To overturn that ruling we must find that the evidence at least raises a question of material fact.

■ Mrs. Gert relies on the various omissions and failures to disclose that she finds in the evidence as proof of an intent to defraud. In this regard, she points to three alleged deceptions as proof of this intent: she claims that the defendants withheld news of the increasing backlogs; she claims that they withheld information about a switch to a more favorable sort of contract; and she claims that the announcement of the merger was misleading. Apparently she feels that it is the interrelationship of the claimed omissions that supports the inference of a scheme or plan. There are a number of reasons why that cannot be so in this case.

For one thing, as the district court found, there were ample disclosures of just the information that Mrs. Gert claims was withheld. Elgin Form 10–K for 1974, submitted on March 20, 1975, listed the back-

---

**3.** The increase in backlogs is an increase in work contracted for, but not yet completed or paid for. The backlog of a company in the Engineering Group is not by itself an indication of financial health; should there be a sudden increase in costs, for example, the company that has contracted to do the work for a fixed price might lose money. A cost-plus contract guarantees that costs will be covered; if all contracts are of that sort, a large backlog is generally a sign of health.

**4.** At some points in her brief Mrs. Gert does argue that the "one for one" part of the announcement was false, and that there never was an agreement for a one for one consolidation. Appellants Br. at 14. That suggests that the announcement of a one for one consolidation was misleadingly made to drive down the price of the stock. Elsewhere, however, Mrs. Gert argues that the defendants really did intend such a merger, and were only stopped by unforeseen circumstances. *Id.* at 25, 30. That, she argues, proves their intention to take over Elgin at below-value prices.

logs as totalling $148 million in uncompleted projects; the similar report for 1973—a year in which the engineering group held the highest backlog in its history to that time, according to the 1973 annual report—listed backlogs at $49 million. The annual report for 1974, released in April, 1975 described the backlog situation and indicated the switch to cost-plus contracts.[5] Mrs. Gert objects that the 10–K filed in March of 1975 did not mention the increase in backlogs for the first months of 1975, and that is true; but the 10–K was for 1974, and information concerning 1975 would not have been appropriate in that report.

The transcript of the Annual Stockholders Meeting on May 21, 1975 is revealing. There was considerable unhappiness about the proposed consolidation with U & I evident at the meeting. But what is most striking is that all the information Mrs. Gert argues was withheld was in fact amply disclosed. It becomes apparent from reading the transcript of the meeting that U & I did hope to cash in on some good will that had been created with Elgin stockholders by consolidating the two firms on a one for one basis. Transcript of Stockholders' Meeting at 20–21. Resistance among the stockholders was based on apparently common knowledge that although the market value of the two stocks was roughly the same, Transcript at page 68, the book value of Elgin stock was perhaps twice that of U & I, Transcript at 17. The only justification offered by Elgin's officers for the apparently unfavorable consolidation was that such a merger would provide new scope for the wonderful managerial talents of U & I's management to be made available to Elgin. Transcript at 21–22. The amount Elgin held in backlogs as of April 1975—$250 million—was mentioned. Transcript at 22, 47. Mrs. Gert says that that proves nothing about intent to defraud,

because it came out only under prodding by a shareholder. We are not sure that information disclosed unwillingly should count as information not disclosed, or how the scheme could have continued once the disclosure was made, even though unwilling; but happily that is all irrelevant. Although the amount of the backlog was given early in response to a shareholder's question, Transcript at pages 18–22, it was also part of the president's prepared report, which he read at the meeting, Transcript at page 47. There was evidently no intention to withhold either the huge growth in backlogs or the change to cost-plus contracts, which was also discussed, Transcript at 47; and although the merger was presented as a live possibility, there is no indication in the record that it was not in fact a live possibility at that time. Although there may have been a disparity in the book values of the stocks that would have benefited U & I in a one for one or even a one for 1.2 consolidation, there was no effort to hide these facts, only an effort to explain or justify them.

On March 2, 1976, two days before Mrs. Gert sold her stock at $28.50 a share, Elgin reported record sales and earnings and declared a dividend. We notice that throughout this period Elgin's reports were *guardedly* positive and *cautiously* optimistic, but there seems to have been good reason for caution. Under section 12(2) of the Security Act of 1933, 15 U.S.C. § 77*l*(2), a seller who included misleadingly optimistic statements in a prospectus would be subject to rather heavy liability. But we do not see that Mrs. Gert can point to a single piece of favorable information that would have been relevant that could not be gleaned from reports that Elgin itself made at the time.

For another thing, a duty to disclose arises only if defendants set out to buy or

5. A somewhat favorable aspect of the economy relating to the continuing growth in demand for energy sources has developed substantial backlogs of contracts in the engineering and construction operations of the company. With all recent contracts containing provisions that will discount any adverse exposure

the company may have due to inflationary trends,. it is apparent that the company can anticipate a continuing and improved profitable performance in 1975 and several years ahead.
Elgin Annual Report to Stockholders for 1974 at 2.

sell, *Fridrich v. Bradford,* 542 F.2d 307, 318 (6th Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith,* 495 F.2d 228, 236 (2d Cir.1974). The only trading by the defendants was Elgin's, under the tender offer at the end of the period, and U & I's acquisition of 57,000 shares in two transactions arranged in June of 1975. There is no dispute here about the adequacy of the information that accompanied Elgin's tender offer. U & I purchased the 57,000 shares soon after the stockholder's meeting, and therefore soon after the disclosure of fairly precise information about backlogs and contracts. No one has disputed the accuracy of the figures given on any of these occasions.[6]

Mrs. Gert contends that in addition to these two sets of purchases, U & I acquired Elgin stock by having an increased share of South Bay stock after the buy-back of that stock in February 5, 1975. South Bay owned Elgin stock; and when others sold back their South Bay stock and U & I did not, U & I naturally ended up with an increased share of South Bay and, consequently, of the Elgin stock that South Bay held. In this indirect way U & I may be said to have purchased Elgin stock on that occasion. But we have already seen that the tender offer was not misleading. The market value of Elgin stock was indeed what South Bay said it was, about seven dollars a share. The book value may have been higher; many stocks were then selling below their book value. In any case, book value is publicly available, and it is not clear what it would have added to the offer to have included that information.[7] As far as any other value is concerned— *e.g.,* a "true" value based on knowledge of backlog, etc.—anything South Bay might have said would surely have been speculative.

Moreover, there is nothing to suggest that the announcement that a consolidation was being considered was false. Mrs. Gert herself vacillates on this, suggesting at certain points that defendants had every intention of going ahead with the consolidation.

Finally, we are unable to discern any materially misleading disclosures made by Elgin itself, and therefore we find no duty to correct any such disclosure.

In sum, the district court was right to grant summary judgment. There is no evidence to support the claim that there was a scheme to withhold information.

### III.

This suit went before the district court as a class action. The class was properly certified. Mrs. Gert attempted to have defendants produce a list of names of class members—everyone who sold Elgin stock between February 5, 1975 and fifteen trading days after March 8, 1976—but before a list was produced the district court granted the defendants' motion for summary judgment.

When a class has been certified as the class here was, under Rule 23(b)(3) of the Federal Rules of Civil Procedure, notice and an opportunity to opt-out must be sent to absent class members. FED.R. CIV.PRO. 23(c)(2). No such notice was given here. A personal judgment entered without jurisdiction over the person violates due process and is void. *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Notice to (b)(3) class members is an unambiguous requirement for jurisdiction. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

---

**6.** The district court found that U & I's purchase was irrelevant to a duty to make information public, since that purchase was a private, "face-to-face" transaction. We find it unnecessary to distinguish the two markets here.

**7.** "Book value: The value of a corporation according to its accounting records. It is computed by subtracting all debts from assets. The remainder represents total book value ... In (annual) reports of corporations, book value is usually represented on a per share basis." *McGraw Hill Dictionary of Modern Economics* (3d ed. 1983).

■ The district court's order purports to rule against the entire class. Insofar as it does, we set it aside as void. The order of the district court granting summary judgment to the defendants is affirmed as to Mrs. Gert.