**Frederick RAND, Plaintiff,**

v.

**CULLINET SOFTWARE, INC., Defendant.**

**Civ. A. No. 86–2473–WF.**

United States District Court, D. Massachusetts.

March 1, 1994.

Order of Decertification March 18, 1994.

Mitchell H. Kaplan, Choate, Hall & Stewart, Boston, MA, for Frederick Rand.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, MA, for Cullinet Software, Inc.

## MEMORANDUM AND ORDER

WOLF, District Judge.

This case involves allegations of securities fraud. Frederick Rand purchased 500 shares of Cullinet Software, Inc. ("Cullinet") common stock on April 16, 1986. Rand, representing a class of investors who purchased

Cullinet stock between August 6, 1985 and July 29, 1986, contends that Cullinet engaged in a course of conduct which violated the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the related Rule 10b–5, and the common law of Massachusetts concerning negligent misrepresentations. Rand relies principally on the allegations that Cullinet perpetrated a fraud on the market by making material misstatements regarding the "pipeline" of prospective business it had, and by making material omissions in failing to acknowledge the impact of competition within the industry as a cause for its decline in earnings. Cullinet has moved for summary judgment on all of Rand's claims.

As set forth below, the court finds that if Cullinet made any misstatements or omissions, they were corrected and rendered immaterial by subsequent information brought into the market by Cullinet and others. Therefore, a reasonable jury could not conclude that a fraud on the market occurred. Accordingly, defendant's motion for summary judgment on Rand's federal claims must be allowed.

Rand's pendent negligent misrepresentation claim also falls to Cullinet's motion for summary judgment, as Rand has not offered any evidence to prove he was in privity with Cullinet, or that Cullinet had actual knowledge of his reliance, as required by the law of Massachusetts.

Moreover, even assuming the evidence were adequate to present a litigable fraud on the market claim for a short period of time, a reasonable jury would have to conclude that any illegal course of conduct ended by the time Rand purchased his Cullinet stock. Therefore, Rand would not be an adequate representative of the class he wishes to represent. Accordingly, decertification of the class for lack of an adequate representative and summary judgment against Rand on his personal claims is, at a minimum, appropriate.

In view of the alternative possible dispositions of this matter, the court will consult counsel before entering judgment for defendants.

## I. The Procedural History

During the relevant period, Cullinet was a Massachusetts corporation engaged in the development, marketing, and support of computer software for use with IBM mainframe and other computer models. Cullinet's stock was traded on the New York Stock Exchange. Cullinet's Statement of Undisputed Material Facts ("CSUMF") ¶ 1.

Rand, a citizen of New York, purchased 500 shares of Cullinet common stock on April 16, 1986 at the price of $12.25 per share. Plaintiff's Substitute Statement of Material Facts ("PSMF") ¶ 1. On July 29, 1986, Cullinet announced that it would incur a loss in the first quarter of fiscal year 1987, and that losses in the following two quarters were possible as well. Upon this disclosure, the price of Cullinet stock fell the following day from $10.75 to $8.125. Amended Complaint ("Am.Compl.") ¶¶ 72–73.

Rand alleges that from August 6, 1985 to July 29, 1986, Cullinet made numerous statements, portions of which were false and misleading when made, including: that any reduction in earnings was an aberration; that any reduction in earnings was due to economic conditions, and not to competition; and that Cullinet's pipeline of sales prospects was promising.

Rand filed a class action complaint on August 22, 1986, alleging a scheme and course of conduct by Cullinet to engage in securities fraud. On August 11, 1989, Rand was, pursuant to Federal Rule of Civil Procedure 23(b)(3), certified as the sole representative of the class of all purchasers of Cullinet common stock damaged as a result of the alleged scheme and continuing course of conduct of Cullinet during the period August 6, 1985 through July 29, 1986. The class certified did "not include purchasers during the class period whose claims are based exclusively on an alleged material misrepresentation or omission, but who do not contend that such misrepresentation or omission was part of a common course of conduct." *Rand v. Cullinet Software, Inc.*, Order, C.A. No. 86–2473 (D.Mass. Aug. 11, 1989). The parties subsequently agreed to postpone sending notice of class certification pursuant to Fed.

R.Civ.P. 23(c)(2) until the motion for summary judgment was decided.

Rand's motion to amend his complaint to add an additional count of negligent misrepresentation against Cullinet under Massachusetts law was allowed on September 22, 1993.

A hearing on Cullinet's motion for summary judgment was held on November 18, 1993.

## II. *Discussion*

### A. *The Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.,* 722 F.2d 922, 928 (1st Cir.1983); *Attallah v. United States,* 955 F.2d 776, 779 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

In determining the merits of a motion for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine; and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* To determine if a dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.; Medina–Munoz,* 896 F.2d at 8; *Oliver v. Digital*

*Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

Generally, in a Rule 10b–5 case, "[p]laintiffs may defeat summary judgment only by showing a genuine issue of material fact with regard to a particular statement by [defendant] or its insiders." *In re Apple Securities Litigation,* 886 F.2d 1109, 1118 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Where, as here, plaintiff's claim relies upon an alleged fraudulent course of conduct, a genuine issue must be shown as to several such statements.

For the purposes of Cullinet's motion for summary judgment, the key question is whether in light of all the information available to the investing public, the plaintiff could persuade "a reasonable juror to find that a reasonable investor would view information allegedly withheld by defendants as significantly altering the total mix of available information to investors." *Steiner v. Tektronix, Inc.,* 817 F.Supp. 867, 882 (D.Ore. 1992); *see also Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988); *Milton v. Van Dorn Co.,* 961 F.2d 965, 969 (1st Cir.1992). As set forth below, careful analysis demonstrates that Cullinet's alleged misstatements and omissions could not, in this sense, properly be deemed material.

### B. *The Rule 10b–5 Claim*

Rule 10b–5 was promulgated pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and provides that it is unlawful for any person, either directly or indirectly, by act or by omission, to commit fraud in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b.5. Rule 10b–5 implicitly creates a private right of action for purchasers or sellers of securities. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975); *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 24 (1st Cir.1987).

In order to prevail on a rule 10b–5 claim, a plaintiff must show: (1) a material misstatement or omission by the defendant; (2) scienter; (3) reliance; and (4) due care by

the plaintiff. *See, e.g., Blue Chip Stamps,* 421 U.S. at 731, 95 S.Ct. at 1923; *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804 (1st Cir.1987); *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1448 (D.Mass.1989).

■ In order for an omission or misstatement "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983–84 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *Milton,* 961 F.2d at 969. Where the materiality inquiry is being made with regard to speculative information or judgments about future events, "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'" *Basic,* 485 U.S. at 238, 108 S.Ct. at 986 (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968)); *see also Milton,* 961 F.2d at 970.

■ The scienter requirement of Rule 10b–5 is satisfied if plaintiffs prove "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). In the absence of scienter, the Court of Appeals for the First Circuit has assumed, without deciding, that recklessness amounting to indifference is an acceptable substitute. *Hoffman v. Estabrook & Co.,* 587 F.2d 509, 516 (1st Cir.1978). The Court of Appeals for the First Circuit has characterized a reckless misrepresentation as "one that departs so far from the standards of ordinary care that it is very difficult to believe that the speaker was not aware of what he was doing." *First Commodity Corp. v. Commodity Futures, Inc.,* 676 F.2d 1, 7 (1982).

■ As an alternative to direct reliance on a statement or statements, a plaintiff may bring a Rule 10b–5 claim under the fraud on the market theory on which Rand relies:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendant's fraud and the plaintiff's purchase of stock is no less significant than in the case of a direct reliance on misrepresentations."

*Basic,* 485 U.S. at 241–42, 108 S.Ct. at 988–89 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3rd Cir.1986)). "[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of market price may be presumed." *Id.,* 485 U.S. at 247, 108 S.Ct. at 991.

■ This presumption of reliance is, however, rebuttable. Any "showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* at 248, 108 S.Ct. at 992. For example, even if fraudulent statements were made in an attempt to manipulate the market price of a security, if corrective information "credibly entered the market and dissipated the effects of the misstatements, those who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud." *Id.* at 248–49, 108 S.Ct. at 992–93. This has come to be known as the "truth on the market" defense. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 516 (7th Cir.1989).

This truth on the market defense was foreshadowed by the Supreme Court in *Basic* when it stated:

> We note there may be a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed, for 14 months, on the basis of the three public statements.

Proof of that sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate.

485 U.S. at 249 n. 29, 108 S.Ct. at 992 n. 29.

This observation, however, does not mean that it is always necessary or appropriate to have a trial to establish a truth on the market defense. In *Apple,* the Court of Appeals for the Ninth Circuit was confronted with the question of whether the presumption of reliance in a fraud on the market case had been successfully rebutted in the summary judgment context. The plaintiffs in *Apple* alleged that the defendant had made overly optimistic statements regarding its new computer model without disclosing some of the problems with the machine which its own testing and test marketing had uncovered. 886 F.2d at 1111–12. As to all but two of the alleged misstatements, the court found that the plaintiffs' claims could not survive summary judgment under a fraud on the market theory because:

> At least twenty articles stressed the risks [defendant] was taking, and detailed the underlying problems producing those risks. Many of the optimistic statements challenged by plaintiffs appeared in those same articles, essentially bracketed by facts which plaintiffs claim [defendant] wrongfully failed to disclose. The market could not have been more aware of [the new product's] risks.

*Id.* at 1116. The Court of Appeals for the Ninth Circuit concluded that "the mechanism through which the market discovered the facts in question is not crucial." *Id.* at 1114. However, in order to have a sufficiently curative effect, the dissemination of the subsequent information must be proportional to the original misstatement or incomplete statement. *Id.* at 1116.

When there have been curative disclosures by a defendant or others, the key question on summary judgment is whether, in view of the information in the market from all sources, a reasonable jury could conclude that any misconduct by the defendant was material. More specifically, the issue on summary judgment is whether a rational jury could find that full disclosure by the defendant would have significantly altered the total mix of information available to the reasonable investor. *Id.* at 1115.

The truth on the market defense has been adopted in a number of jurisdictions. *See Peil,* 806 F.2d at 1161 (3rd Cir.) ("defendants are ... free to assert appropriate defenses, including ... that the market did not respond to the alleged misrepresentation"); *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1262 (4th Cir.1993) (granting summary judgment against claims after date on which it determined market was fully informed of relevant information); *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) ("presumption that the market price has internalized all publicly available information cuts both ways"); *Fine v. American Solar King Corp.,* 919 F.2d 290, 299 (5th Cir.1990), *cert. dismissed sub nom., Hurdman v. Fine,* —— U.S. ——, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991) ("presumption of reliance can be rebutted by showing ... that the nondisclosures did not affect the market price"); *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson,* 3 F.3d 208, 213–14 (7th Cir.1993) ("fraud-on-the-market theory approved in *Basic* ... has a truth-on-the-market corollary"); *Wielgos,* 892 F.2d at 516 (7th Cir.1989) ("Knowledge abroad in the market moderated, likely eliminated, the potential of a dated projection to mislead. It therefore cannot be the basis of liability."); *Sailors v. Northern States Power Co.,* 4 F.3d 610, 613 (8th Cir.1993) (upholding summary judgment because, among other things, the mass media and specialized press provided information).

While the Court of Appeals for the First Circuit has not addressed this issue, this court finds the truth on the market defense to be logical and compelling. Indeed, it is the corollary of this court's observation in *Kirby v. Cullinet Software, Inc.,* that:

> Reliance on the market also includes reliance on "statements of third parties [such as brokers] that merely reiterated, digested, or reflected the misstated [market] information that forms the basis of the securities fraud claims".... "Such a rule is necessary if the salutary purposes of the

'fraud on the market' theory are not to be gutted, for it is likely that many investors rely upon information digested by others and not simply on the market."

116 F.R.D. 303, 307 (D.Mass.1987) (quoting *Grossman v. Waste Management, Inc.,* 100 F.R.D. 781, 788 (N.D.Ill.1984)); *see also Randle v. Spectran,* 129 F.R.D. 386, 391 (D.Mass.1988) (Keeton, J.) (quoting *Kirby*). More specifically, if the explicit or implicit dissemination of a defendant's statements by third parties constitutes a source of liability under the fraud on the market theory, statements by third parties should also be assessed to determine the materiality of a defendant's statements or omissions. As the Court of Appeals for the Fourth Circuit said, the "presumption that the market price has internalized all publicly available information cuts both ways." *Raab,* 4 F.3d at 289. While statements made by corporate insiders may be accorded greater weight than those of third parties, *In re Seagate Technology II Securities Litigation,* 802 F.Supp. 271, 274 (N.D.Cal.1992), the essence of this defense is that the source of information is not dispositive of the issue of liability.

 In this case, Rand alleges that there are several categories of actionable statements or omissions for which defendants should be held liable. These are: (1) a statement characterizing Cullinet's decline in earnings as an aberration; (2) several statements of generalized corporate optimism; (3) several statements which failed to acknowledge the role of competition in Cullinet's decline in revenue; (4) several statements regarding Cullinet's pipeline of prospective business; and (5) several statements made after Rand's purchase of Cullinet stock. As described below, the defendant's statements and alleged omissions do not, individually or cumulatively, suffice to establish a triable case.

### 1. *The Aberration Statement*

 On August 14, 1985, the *Wall Street Journal* published an article which included an interview with Cullinet Chairman John Cullinane and contained the following remarks:

Cullinet has done so well at its business ... that *Mr. Cullinane says he considers the first-quarter results an "aberration."* This despite the fact that analysts say the company is behind on shipments of some software and having trouble selling other programs.

\* \* \* \* \* \*

But Mr. Cullinane has curtailed his outside activities recently as business has turned sour. He blames the earnings decline on a slump in computer spending, more competition and customers unexpectedly delaying purchases. *He won't predict results for the current quarter ending Oct. 31, but says he is "optimistic" because the "pipeline" of prospective orders "looks very strong."* Also, Cullinet has cut expenses by cancelling its television advertising and limiting hiring. (emphasis added). "Cullinet's Chief Waxes Philosophical As Long String of Profit Rises Is Ended," *Wall St. J.* (Aug. 14, 1985) ("August 14, 1985 *Wall St. J.* article"), Cullinet's Appendix to Memorandum in Support of Motion for Summary Judgment ("Cull.App."), Ex. 7.

Rand contends that by stating that the results of the first quarter were an "aberration," Cullinane implicitly adopted Cullinet's prior forecast: growth levels between 30% and 50% for the 1986 fiscal year and beyond, and continuation of the traditional operating margin of 20%. Am.Compl. ¶ 42; *see also, Kirby,* 721 F.Supp. at 1446–47 (discussing Cullinet predictions).

A reasonable jury could not, however, interpret Cullinane's statement that the first quarter was an aberration as a prediction of 30–50% growth or 30% profit. Although "predictions are inherently uncertain, they are not exempt from the anti-fraud provisions of the federal securities laws. . . . materially misleading predictions made with the scienter are actionable." *Kirby,* 721 F.Supp. at 1449; *see also, Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.1985), *cert. denied sub nom., Weinstein v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Colby v. Hologic,* 817 F.Supp. 204, 210 (D.Mass. 1993) (citing *Kirby* ). However, when viewed in context, Cullinane's comment could not properly be construed as a prediction. Rath-

er, the *Wall Street Journal* reported in the same article that Cullinane refused to predict results. This explicit disclaimer would compel a reasonable jury to conclude that Cullinane's characterization of the Company's recent results as an aberration was not an actionable prediction.

### 2. *Statements of General Optimism*

■ Rand also contends that Cullinet's August 6, 1985 statement that "[w]e are optimistic about the future," Cull.App., Ex. 2, and August 20, 1985 statement that "[w]e are optimistic about the year ahead," Cull.App., Ex. 4, are actionable. Rand asserts that the validity of such expressions of optimism is put in dispute by the testimony of Cullinet Regional Manager Ronald Dolinsky, who claims that Cullinet was suffering from software and competition problems at the time the statements were made. Deposition of Ronald Dolinsky ("Dolinsky Dep. I") at 51–54, Rand's Appendix to its Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Rand App."), Ex. 10.

While "statements of reasons, opinions, or beliefs" regarding material facts made without a reasonable basis are actionable, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, ——–——, 111 S.Ct. 2749, 2757–58, 115 L.Ed.2d 929 (1991), the statements at issue here are too general for a reasonable investor to have considered them to be important in deciding whether to make or continue an investment in Cullinet stock. In the total mix of information, they were not material. Thus, they do not provide a basis for a Rule 10b–5 action. *See Colby*, 817 F.Supp. at 210–11 (vague comment "long term prospects are bright" is not statement which reasonably well-informed investor would have reasonably considered so significant as to alter mix of information bearing on investment); *In re Healthco International, Inc. Securities Litigation*, 777 F.Supp. 109, 115 (D.Mass. 1991) (statement that defendant was "comfortable" that deal would close before deadline unaccompanied by any specific quantification or projected results implying certainty falls short of qualifying as material misrepresentation); *Tektronix*, 817 F.Supp. at 879 (vague expressions of optimism as to future performance is mere puffing and is not actionable).

### 3. *Failure to Acknowledge Competition*

■ Rand alleges that Cullinet failed to acknowledge the role which competition played in the decline of its revenue, ascribing the problem instead to economic conditions affecting prospective customers. More specifically, Rand focuses on defendants' statements that: (1) "Cullinet's competitive position was very strong ... but results are impacted because of ... economic conditions affecting prospects," August 6, 1985 Press Release, Cull.App., Ex. 4; (2) decreased growth in revenue "primarily" result of "adverse economic conditions affecting prospective customers", Cullinet's Form 10–Q, filed September 16, 1985, Rand App. Ex. 5; and (3) Cullinet's similar statement in its Form 10–Q, filed December 13, 1985, Cull.App., Ex. 1A. Rand argues that the foregoing statements were false and misleading when made, and served to reduce the decline in Cullinet stock, which would have otherwise been more precipitous.

On the basis of the depositions of Cullinet Regional Manager Dolinsky, Cullinet President Robert Goldman, and Cullinet's Executive Vice President in charge of sales Frank Chisholm, a reasonable juror could find that competition, and in particular competition from IBM, had a significant impact on Cullinet's sales during the period of August to September 1985 in which the foregoing statements were made. *See* Dolinsky Dep. I at 65–73, Rand App., Ex. 10; Deposition of Ronald Dolinsky ("Dolinsky Dep. II") at 47–50, Rand App., Ex. 11; Deposition of Robert Goldman, ("Goldman Dep. I") at 155–56, Rand App., Ex. 11; Deposition of Frank Chisholm ("Chisholm Dep.") at 170–71, Rand App., Ex. 36. A reasonable juror could also find that these statements were made either recklessly or with scienter. Moreover, if defendant's statements were the only evidence, a jury could properly find that a reasonable investor would find the impact of competition to be an important element of the total mix of information considered in reaching an investment decision.

It is not, however, proper to view Cullinet's statements about competition in isolation. When viewed in the context of the widespread and contemporaneous recognition in the market of the role of competition upon Cullinet's fortunes, a jury would be compelled to conclude that Cullinet's comments were immaterial.

The market was at all relevant times aware of the impact of competition on Cullinet, particularly the effect of competition from IBM, as a survey of pertinent contemporaneous publications demonstrates. The litigants have brought to the court's attention over twenty reports published between August 1985 and March 1986, at least 17 of which explicitly discuss the competitive landscape. *See* Rand App., Exs. 3, 42, 44–46; Cull.App., Exs. 5–6, 8–14, 17–22; Cull.Supp. App., Ex. E. For example, in October 1985, one information service opined that "the primary cause of Cullinet's recent financial decline is the market impact of IBM's new DB2 relational database system." Montgomery Securities Analyst Report, "Institutional Research: Cullinet Software, Inc.," 38–41 (Oct. 31, 1985), Cull.App., Ex. 12. In November 1985, Goldman Sachs wrote that "[c]ompetition continues to intensify in the database management system (DBMS) market," and that "IBM represents the most ominous challenge." Goldman Sachs & Co., "Industry Commentary" (Nov. 4, 1985), Cullinet Supplemental Appendix ("Cul.Supp.App."), Ex. E. In December 1985, Paine Webber, Inc. stated that its "radically lowered expectations for Cullinet ... stem from competitive concerns in all areas of its business," and in particular from IBM. Paine Webber, Inc., "Company Report: Cullinet," 58–60 (Dec. 5, 1985), Rand App., Ex. 44. Also in December 1985, the Gartner Group reported on the competitive environment in which Cullinet operated, stating:

> First and foremost, IBM has strengthened its position considerably among large accounts.... While IBM's efforts have hurt Cullinet at the high end of the DBMS market, increased competition from a host of independent investors ... has led to a price and feature war at the low end.

The Gartner Group, "Software Management Strategies" (Dec. 18, 1985), Cull.App., Ex. 13.

In addition to the third parties who had recognized and publicly discussed the role of competition in Cullinet's decline, Cullinet itself openly acknowledged the impact of competition. In the August 14, 1985 *Wall Street Journal* article on which Rand in part bases his claim, Cullinane was quoted as citing "more competition and customers unexpectedly delaying purchases" as among sources causing decline in earnings. Cull.App., Ex. 7. Similarly, Cullinet's third quarter Form 10–Q, filed March 14, 1986, stated that an "increasingly competitive environment" caused Cullinet's revenue decrease. Cull. App., Ex. 1B.

Accordingly, with regard to the impact of competition, this case is comparable to *Apple*, in which numerous articles and statements by the defendant were found on summary judgment to have fully and fairly informed the market. 886 F.2d at 1111–12. On this record, no reasonable jury could find that additional disclosures by Cullinet would have had any material impact upon the total mix of information available to a reasonable investor on the issue of competition. *See Cooke*, 998 F.2d at 1262 ("market was so overwhelmed with [pertinent] information ... that no reasonable trier of fact could conclude otherwise").

### 4. *The Pipeline Statements*

Rand also complains of statements, made on August 6, August 14, and September 24, 1985, referring to the "pipeline" of Cullinet's potential sales prospects. These prospects were characterized by Cullinet as "excellent" (statement of August 6, 1985, Cull.App., Ex. 4), "very strong" (August 14, 1985 *Wall St. J.* article, Cull.App., Ex. 7), and "very encouraging." Memorandum to Shareholders (Sept. 24, 1985), Cull.App., Ex. 7.

Rand fails to acknowledge, however, that contemporaneous with and following the foregoing statements, Cullinet disclosed problems it was having in producing sales. For example, in August 1985, Brean Murray Foster Securities, Inc. reported that:

> [Cullinet]'s management has stated that its competitive win performance in the first

quarter was as good as it had ever been. *They did not, according to management, lose many decisions; decisions simply weren't being made.* There is evidence, however, that the competitive environment may have caused some of those nondecisions. (emphasis added).

Brean Murray Foster Securities, Inc., "Opinions and Facts," Cull.App., Ex. 5 at 7. Similarly, in October 1985, Goldman Sachs reported that at its "annual meeting, [Cullinet] management discussed continued difficulty in closing orders due to the depressed level of capital spending. Problems are not a one-quarter phenomenon." Goldman Sachs & Co., "Computer Software" at 4 (Oct. 3, 1985), Cull.App., Ex. 11.

As reflected in the foregoing Goldman Sachs report, the market fully perceived the problem with Cullinet's pipeline of which Rand complains. As Smith Barney put it in January 1986:

> The economics of the independent mainframe software vendor are changing.... Uncertainty surrounding IBM's dual database strategy impacted systems software vendors such as Cullinet and Applied Data Research ... and more stringent capital spending for data processing equipment and software resulted in revenue declines for application software vendors. *Longer sales cycles and deferred purchase decisions were symptomatic of these changes....* (emphasis added)

Smith Barney, Harris Upham & Co., Inc., "Company Report: Cullinet" (Jan. 24, 1986), Rand App., Ex. 45 at 76.

Nevertheless, looking at the record in the light most favorable to Rand, a reasonable jury could conclude that in August and September 1985 Cullinet was portraying its pipeline as strong. Dolinsky's testimony puts the strength of the pipeline in August and September 1985 genuinely in dispute.[1] Cullinet's references to its pipeline could properly be deemed to have been material for a limited period of time because sales prospects may be an important element in the total mix of information considered by reasonable investors. With regard to scienter, a reasonable jury could find, in view of Dolinsky's testimony, that such positive statements were at least made with a recklessness amounting to indifference.

However, Cullinet's pipeline statements do not provide a basis for liability in this case because, at a minimum, a reasonable jury would have to conclude that they lost any possible materiality by the time of Rand's purchase. Statements concerning a pipeline of sales prospects are material for only a limited period of time. At some point, those sales have either occurred or have failed to be consummated. While Cullinet's August and September 1985 remarks about its pipeline may have been important for some period of time, eventually they became stale and longer material to decisions being made by investors.

In this case, no statements were made regarding Cullinet's pipeline after September 24, 1985. Rand purchased his shares almost seven months later, on April 16, 1986. In the intervening time, information from many sources, including Cullinet, entered the market reflecting the outcome of sales prospects in the pipeline in August and September 1985.

For example, in its Form 10–Q filed December 13, 1985, for the quarter ending October 31, 1985, Cullinet reported a 1% decrease in revenue "substantially as a result of lower new domestic revenues." Cull.App., Ex. 1A at 9. Similarly, in its Form 10–Q filed March 14, 1986, for the quarter ending January 31,

---

1. Dolinsky testified at deposition that rather than being strong or encouraging, the pipeline for Cullinet products was in fact weak in several key regions as of May 1985. Dolinsky Dep. I at 68–71, Rand App. Ex. 10. Dolinsky asserts that IBM's forthcoming product, a revised "DB2" data base product, presented competitive problems for Cullinet, in that prospective customers were delaying orders to wait for DB2's release in order to compare products. Dolinsky Dep. II at 47–50, Rand App., Ex. 11.

Cullinet argues that, read in context, the testimony of Dolinsky supports the proposition that the pipeline of prospects was extended, and not necessarily eroded. Dolinsky's testimony supports this understanding. Dolinsky Dep., Cull. Supp.App., Ex. B at 95–96 (lengthening of selling cycle "started ... in end of 1984 and accelerated dramatically in August or thereabouts of '85.").

1986, Cullinet attributed its 6% net revenue decrease from the previous quarter to "decreases in revenue [which] occurred primarily in new domestic revenue." Cull.App., Ex. 1B at 9.

As indicated earlier, market analysts fully recognized that pipeline problems—"[l]onger sales cycles and deferred purchase decisions"—were substantially contributing to Cullinet's revenue decline. Smith Barney, Harris Upham & Co., Inc., "Company Report: Cullinet" (Jan. 24, 1986), Rand App., Ex. 45 at 76.

In view of the foregoing Cullinet's statements regarding the status of its pipeline of prospects in August and September of 1985 do not provide a proper basis for a jury to find a continuing course of fraudulent conduct extending to April 1986, when Rand purchased his Cullinet shares, let alone until July 29, 1986, the end of the certified class period.

### 5. *Post-purchase Statements*

Finally, Rand contends that certain statements made after his purchase of Cullinet stock contribute to the merit of his fraudulent course of conduct claim. For the reasons set forth below, this court finds that they do not.

#### a. *The June 18, 1986 Statement.*

On June 18, 1986, Cullinet announced its financial results for the 1986 fiscal year ended April 30, 1986 and for the fourth quarter. David Chapman, then Chief Executive Officer, President, and Vice Chairman of Cullinet, stated:

> Fiscal 1986 was a year of substantial accomplishment during a difficult year for the industry.... In the fourth quarter we began a program of substantially increased investment in new products, research, and sales hiring. These programs, as well as continued uncertainty, will put downward pressure on revenues through the first half of FY'87. *We are optimistic that these investments and ongoing overhead cost containment will provide the opportunity for the company to return to normal revenue and profit growth during the latter half of fiscal 1987 as well as in subsequent years.* (emphasis added)

Rand App., Ex. 8. Rand contends that this statement was false and misleading when made because Cullinet continued to maintain that its problems were temporary in nature and did not acknowledge that they were largely due to increased competition from IBM. Rand maintains that Cullinet had no reasonable basis for optimism that normal profit growth would return.

Chapman's statement, however, is not itself material. Nor does the evidence place in genuine dispute its accuracy. Cullinet only claimed that it was "optimistic" that its actions "[would] provide the opportunity" for a "return to normal revenue and profit growth." As described earlier, expressions of optimism are generally not actionable. There is no evidence that the facts concerning investments and containment of overhead were inaccurate. *Cf. Steiner v. Unitrode,* 834 F.Supp. 40, 44–45 (D.Mass.1993) (subsequent admission by defendant of quality control problems permitted inference of fraudulent intent concerning previous statements that such problem had been rectified). Nor is there any evidence that these measures did not provide an "opportunity" for Cullinet to return to its historic levels of revenue and profit growth. While an unqualified prediction might have been material, this statement concerning Cullinet's "opportunity" could not reasonably be construed as a prediction that such growth would be resumed. *See Colby,* 817 F.Supp. at 210–11; *Tektronix,* 817 F.Supp. at 879. Finally, once again, by June 1986 the market was fully informed of the effect that competition was having on Cullinet's performance and prospects.

As discussed earlier, where, as here, the materiality question concerns speculative judgments about future events, "materiality 'will depend at any given time upon a balancing of both the indicated probability that an event will occur and the anticipated magnitude of the event in light of the totality of company activity.'" *Basic,* 485 U.S. at 238, 108 S.Ct. at 986 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968)). In this case, the June 18, 1986 statement is not itself material.

b. *The July 28, 1986 Annual Report.*

On July 28, 1986, Cullinet filed its Annual Report for the fiscal year 1986 with the Securities and Exchange Commission. In the prefatory "Letter to Shareholders," Cullinane and Chapman, stated, in part, that:

Fiscal Year 1986 was a year of substantial accomplishment for Cullinet Software, Inc., during a period of industry uncertainty. We recorded sequential quarterly growth during the year despite unfavorable market conditions and economic factors. *Customer acceptance of our products remains strong as you will see from the companies represented in the annual report.*

\* \* \* \* \* \*

Late in the year, we began a program of substantially increased investments in new products, research, and sales staff. While these investments, coupled with some continuing industry uncertainty, may bring short-term downward pressure on revenues and profits, *we firmly believe that they will enable us to capitalize on significant growth opportunities during the second half of Fiscal Year 1987 and beyond.* (emphasis added).

Cull.App., Ex. 15 at 5.

The Report, under the heading "Management's Discussion," subheading "Revenues," in the Financial Section, also states:

Despite a strong fourth quarter, the Company's net revenue remained flat during fiscal 1986 compared to increases of 53% during fiscal years 1985 and 1984. Domestic revenue from new licenses of the Company's software and renewal fees decreased 8% compared to increases of 52% and 50% in fiscal 1985 and 1984. *We attribute this to an overall slowdown in the growth of the of the software industry during fiscal 1986 caused in part by reduced capital spending on the part of prospective customers.* (emphasis added).

Cull.App., Ex. 15 at 30.

Rand asserts that the foregoing statements were false and misleading when made because Cullinet continued to maintain that its problems were temporary in nature and that Cullinet had no reasonable basis for

optimism that normal profit growth would return. Am.Compl. ¶¶ 67–70.

Rand's contentions are, however, once again incorrect. No statement in the July 28, 1986 Annual Report predicts a return to Cullinet's historic, high levels of revenue and profit growth. The information in the Annual Report provides an adequate basis for the claim that customer acceptance remained "strong." *See, e.g.,* Cullinet Annual Report 1986 at 24–27, Cull.App., Ex. 15 (partial listing of new customers). Rand has offered no evidence to place this claim genuinely in dispute.

With regard to the statement concerning Cullinet's anticipation of possible short-term reductions in revenues and profits, and its belief that its new investments would enable Cullinet to capitalize later on growth opportunities, Cullinet did not make an actionable prediction. *Compare Colby,* 817 F.Supp. at 210–12 (optimistic and vague forecast "prospects for long term growth are bright" not actionable prediction) *with Kirby,* 721 F.Supp. at 1449–51 (Cullinet forecast of May 30, 1985 predicting a specific rate of anticipated growth and operating margin was actionable).

Finally, Rand's claim that Cullinet again improperly failed to mention the impact of competition in the Annual Report is insufficient to survive defendant's motion for summary judgment. In view of the abundant information in the market concerning the effect competition was having on Cullinet, a reasonable jury certainly could not conclude that Cullinet's attribution of its decline in revenues to an overall slowdown in the growth of the software industry caused in part by reduced customer spending was materially false or misleading.

C. *Conclusion Regarding Federal Claims*

For the reasons previously stated, the court finds that none of the defendant's statements provide a basis for· a trial of Rand's Rule 10b–5 claim that Cullinet engaged in a fraudulent course of conduct from August 6, 1985 to July 29, 1986. The court recognizes, however, that defendants' alleged misstatements and omissions must also be analyzed in the context of each other because

"a common pattern of misconduct may be found based on cumulative and interrelated material misstatements or omissions of fact in communications to class members by corporate officers or directors which have the overall tendency over a period of time to mislead investors or traders as to the value of their security." Herbert B. Newberg & Alba Conte, 4 *Newberg on Class Actions* § 22.16 at 22–49 (3d ed. 1992). Nevertheless, the court also finds that the evidence viewed cumulatively is insufficient to permit a reasonable jury to conclude that the defendant's conduct perpetrated a fraud on the market during the class period. Accordingly, the court may require notice to class members of the class certification and, after providing a reasonable time for investors to opt out, enter summary judgment against the remaining class members. *See In re Bally Manufacturing Securities Litigation,* 144 F.R.D. 78, 81–82 (N.D.Ill.1992), *aff'd sub nom., Arazie v. Mullane,* 2 F.3d 1456 (7th Cir.1993) (Where dismissal and certification are decided simultaneously, "unless absent class members are given the opportunity to opt out of the class, the judgment is only binding on the named plaintiffs...."); *Gert v. Elgin National Industries, Inc.,* 773 F.2d 154, 159 (7th Cir.1985) ("When a class has been certified ... under Rule 23(b)(3) ... notice and opportunity to opt-out must be sent to absent class members.").

As discussed preliminarily with counsel for the parties at the September 21, 1993 conference, however, there is an alternative means by which this case could be resolved which may be more appropriate than the issuance of notice to the class and the ultimate entry of summary judgment on the class claims. The evidence makes vividly clear that any possible fraudulent course of conduct by defendants ended before Rand purchased his Cullinet stock on April 16, 1986. By that time, the results of the possible sales in the pipeline as of August and September 1985 were known and Cullinet had explicitly recognized in its March 14, 1986 Form 10–Q the impact of competition on its performance. If a litigable fraudulent course of conduct claim existed for the period August 6, 1985 to March 14, 1986, the court could, pursuant to Fed.R.Civ.P. 23(c), amend its class certification and define the class as including only investors who purchased between August 6, 1985 and March 14, 1986. *See Basic,* 485 U.S. at 249 n. 29, 108 S.Ct. at 992 n. 29 ("the District Court retains the authority to amend the certification order as appropriate"); *In re Harcourt Brace Jovanovich, Inc. Securities Litigation,* 838 F.Supp. 109, 115 (S.D.N.Y.1993) ("The court may modify the class, establish subclasses, or decertify as appropriate in response to factual development."). Rand, however, did not purchase in that period and, therefore, could not adequately represent that class.

It is axiomatic that all four requirements of Rule 23(a) must be met in order for certification of a class to be proper. *Key v. Gillette,* 782 F.2d 5, 6 (1st Cir.1986). "One of the most important of these requirements is that the representative party fairly and adequately represent the interests of the class. Rule 23(a)(4). This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they are inadequately represented by the named plaintiff." *Id.*

As Rand is not a member of the class of purchasers before March 14, 1986, he cannot adequately represent that class.

[A] fundamental requirement of representatives in a class action is that they must be members of the subclasses they seek to represent. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403[, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453] (1977).... The representatives must 'possess the same interest and suffer the same injury' as their fellow class members. *East Texas Motor Freight,* 431 U.S. at 403 [, 97 S.Ct. at 1896] (quoting *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216[, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706] (1974).

*Roby v. St. Louis Southwestern Railway Co.,* 775 F.2d 959, 961 (8th Cir.1985); *see also, Kreuzfeld, A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991) (discussing typicality in security litigation context).

When, as here, the court finds after class certification that there is not an adequate

class representative, decertification of the class is appropriate. *See Roby,* 775 F.2d at 961–63; *Briggs v. Anderson,* 796 F.2d 1009, 1017–19 (8th Cir.1986); *Krome v. Merrill Lynch & Co.,* 110 F.R.D. 693, 694 (S.D.N.Y. 1986). Accordingly, on the present record the court could decertify the class, and enter summary judgment on Rand's individual claims. This would obviate the need for incurring the expense of notifying class members of the original class certification and of the present decision concerning summary judgment.

The court will afford counsel for the parties an opportunity to address the manner in which judgment should enter in light of the court's analysis of defendants' motion for summary judgment.

### D. *The State Law Negligent Misrepresentation Claim*

■ There is no need to linger long over Rand's claim that defendant made actionable, negligent misrepresentations in violation of the common law of Massachusetts. To prevail on a claim of negligent misrepresentation under Massachusetts law, a plaintiff must prove privity between the parties. *See Steiner,* 834 F.Supp. at 46; *In re Bank of Boston Securities Litigation,* 762 F.Supp. 1525, 1536 (D.Mass.1991); *Hurley v. FDIC,* 719 F.Supp. 27, 34 (D.Mass.1989). Absent such privity, plaintiff must prove that defendant had knowledge of its actual reliance, *Steiner,* 834 F.Supp. at 46; *Hurley,* 719 F.Supp. at 34. In this case, there is no evidence that Rand, or any other investor, was in privity with Cullinet, or that Cullinet had actual knowledge of any purported reliance on its statements. Thus, summary judgment must be granted on Rand's negligent misrepresentations claim.

### III. *Order*

For the foregoing reasons, defendant's motion for summary judgment is meritorious. Counsel for the parties are hereby ORDERED to confer and, by March 17, 1994, inform the court, jointly if possible, of their views concerning the form in which judgment should enter. They shall also file a proposed form of judgment consistent with their posi-

tion(s). If there is a dispute concerning the most appropriate form in which judgment should enter, a hearing will be held on March 29, 1994 at 4:00 p.m.

### ORDER OF DECERTIFICATION

WOLF, District Judge.

By a Memorandum and Order dated March 1, 1994 this Court granted defendant Cullinet Software, Inc.'s ("Cullinet") motion for summary judgment with regard to all of plaintiff Frederick Rand's claims asserted in his Amended Complaint and ruled that Mr. Rand would not, in any event, be a member of any class of purchasers of Cullinet stock who might have had a litigable claim against Cullinet. There exists no other named plaintiff to act as a class representative.

Therefore it is hereby ORDERED that the class of all purchasers of Cullinet common stock damaged as a result of the alleged scheme and continuing course of conduct of Cullinet during the period August 6, 1985 through July 29, 1986 previously certified by this Court in an Order dated August 11, 1989 be, and is, DECERTIFIED.