**P.H. GLATFELTER COMPANY, Plaintiff-Appellant,**

v.

**VOITH, INCORPORATED, Defendant-Appellee.**

No. 85–2037.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1986.

Decided Feb. 25, 1986.

Richard Z. Freeman, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff-appellant.

772

Jon P. Christiansen, Foley & Lardner, Milwaukee, Wis., for defendant-appellee.

Before CUDAHY, FLAUM and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiff, P.H. Glatfelter Co. ("Glatfelter"), appeals the district court's grant of summary judgment for the defendant, Voith, Inc. ("Voith"), on plaintiff's claim of fraudulent misrepresentation, 103 F.R.D. 106. We affirm the grant of summary judgment.

I.

The plaintiff manufacturers paper. In 1963 Glatfelter's predecessor, Bergstrom Paper Company ("Bergstrom"), contracted with Voith's predecessor, Valley Iron Works Corp. ("Valley"), to purchase a paper manufacturing machine. The contract provided that the twenty-four large pulleys on the machine were to be constructed from ductile iron, which is processed to be stronger than grey cast iron. Valley's original specifications for the machine had called for pulleys made of grey cast iron. When Bergstrom expressed concern about the strength of the pulleys, Valley's engineers suggested that ductile iron be used instead. Valley told Bergstrom that it was licensed to manufacture ductile iron, was familiar with its properties and had manufactured many paper machine parts from it. Bergstrom assumed that the pulleys would be manufactured by Valley. Valley, however, subcontracted with C.A. Lawton Co. ("Lawton"), for the manufacture of the pulleys without consulting Bergstrom. Lawton manufactured the pulleys and delivered them to Valley for installation on the paper machine.

The machine itself, including the pulleys, was installed at Bergstrom's mill in September 1964. Later that month Bergstrom's insurance carrier, Hartford Steam Boiler Inspection and Insurance Co. ("Hartford"), conducted a safety inspection of the machine. Hartford expressed concern about the safety of the pulleys because it was aware that pulleys on other paper machines had failed. Its report, issued in November 1964, questioned the suitability of the pulleys and recommended that the pulleys be disconnected during high speed tests of the machine's drive mechanism. Bergstrom would lose substantial paper production if it observed this precaution.

After receiving the insurance report Bergstrom's chief engineer, Orville Ross, telephoned George Reynolds, the engineer at Valley who had supervised the design of the machine. Ross informed Reynolds of Hartford's concerns and recommendation, and asked Valley to assure both Bergstrom and Hartford that the pulleys were constructed from ductile iron and were suitable for the intended use of the machine. Reynolds said that "Bergstrom and Hartford had nothing to worry about because the pulleys on Bergstrom's machine were actually constructed of ductile iron with a strength of 80,000 pounds." Ross Aff. at 5. Ross then requested that Valley put these assurances in writing.

Reynolds referred Bergstrom's request for written assurances to Howard Ainsworth, a staff engineer at Valley. Ainsworth contacted Lawton, and subsequently provided Reynolds with a letter from Frank Noble, a production manager at Lawton. The letter began: "Relative to the taper cone pulleys we furnished you for the Bergstrom Paper Mills, we herewith enclose tests from The Charles Kawin Company on our 60,000# tensile ductile type iron." The accompanying Kawin test results were dated October 8, 1963, and October 17, 1963. The pulleys at issue were not manufactured until the spring of 1964. Both Ainsworth and Reynolds knew that the pulleys for Bergstrom's machine had not even been ordered from Lawton by October 1963. Because both Ainsworth and Reynolds were aware of the dates of the test results, it is logical to assume that they knew that the test results did not reflect testing done on the actual pulleys at issue. The test results also revealed that the metal tested failed to satisfy the stan-

dards recognized in the foundry industry for the lowest grade of ductile iron.

In December 1964, Reynolds responded to Bergstrom's request for written assurances with a letter enclosing copies of the letter from Noble and the Kawin test results. Reynolds' letter read as follows:

Herewith enclosed are four (4) copies of a letter that we received from the C.A. Lawton Company dated December 1, in reply to your recent request for information concerning the construction of the above pulleys.

Kindly note their letter indicates the pulleys on your machine are constructed of ductile iron with a design tensile strength of 60,000 pounds. However, their metallurgical report shows the actual tensile is between 91,370 pounds and 97,360 pounds which means the material is considerably stronger than designed.

. . . .

On this basis we wish to inform you that as a further matter of interest, all drive pulleys on your machine were dynamically balanced at 9000 FPM [feet per minute] in accordance with the contract specification before being shipped to you, and you may be assured they are suitably constructed to operate safely at all speeds you machine is designed to run at including a trip-out speed set 10% above the normal maximum operating speed.

We trust this dispells any qualms you may have concerning the quality of the materials used in your new machine, however, if you have further question, please advise.

Reynolds did not inform Bergstrom that the tests he mentioned could not have been performed on Bergstrom's pulleys. Nor did he inform Bergstrom that the test reports indicated that the metal had failed to meet industry standards.

Later in the month two Hartford representatives met with Reynolds concerning the safety of the pulleys. Reynolds followed up this meeting with a letter addressed to Hartford in January 1965. The letter stated that the pulleys were "actually made from ductile iron" and that they were "certified by the manufacturer to be safe for operating speeds up to and including 9,000 FPM."

In August 1980 one of the pulleys exploded while the machine was in operation, damaging the machine and the Glatfelter facility. Glatfelter was unable to manufacture paper at a normal rate while repairs were being performed and consequently suffered damages for out-of-pocket expenses and lost profits, allegedly in the amounts of $55,000 and $630,000 respectively. An investigation then revealed that the pulleys had been made of grey cast iron rather than ductile iron.

After plaintiff filed suit, Voith moved for partial summary judgment on Glatfelter's fraudulent misrepresentation claims. The motion requested that the court preclude the plaintiff from recovering damages for lost profits from Voith, in accordance with a damage limitation provision in the contract under which the machine had been manufactured. The contractual limitation provision would *not* apply if the defendant's conduct was intentional or reckless. The district court granted the motion, enforced the contractual damage limitation and thus precluded Glatfelter from recovering lost profits from Voith.

The case went to trial in September 1984. All claims were brought against Lawton and the three claims which were not precluded were brought against Voith: general negligence, negligent misrepresentation and strict liability for misrepresentation. During trial Glatfelter settled with Lawton. Plaintiff executed a Pierringer Release and Indemnification Agreement, *see Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963), in return for $500,000. The jury was not informed of the settlement. The jury found both Lawton and Valley liable for negligent misrepresentations. Damages were determined to be $683,601; this represented $629,437 in lost profits and $54,164 in out-of-pocket damages. The jury apportioned the responsibility for Glatfelter's injury thirty percent to Voith and seventy percent to Lawton under Wisconsin's comparative negligence rules. The

court entered judgment against Voith for $16,249.20, thirty percent of the out-of-pocket damages. This judgment did not include a portion of the lost profit damages because the partial summary judgment had the effect of relieving Voith of responsibility for lost profits.

Plaintiff appeals on two grounds. First, plaintiff argues that summary judgment was improperly granted on the fraudulent misrepresentation claims. Second, plaintiff argues that the district court erred in limiting its judgment to thirty percent of the out-of-pocket expenses.

## II.

■ Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Box v. A & P Tea Co.*, 772 F.2d 1372, 1375 (7th Cir.1985). We must view the record and any reasonable inferences drawn from it in the light most favorable to the nonmoving party. *Id.* We are "not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones." *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1218 (7th Cir.1985) (quoting *Parker v. Federal National Mortgage Assoc.*, 741 F.2d 975, 980 (7th Cir.1984)) (emphasis in original).

■ The plaintiff is correct that "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication," *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 11 (7th Cir.1979), and that "resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible." *Federal Deposit Insurance Corporation v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir.1980). The court in *FDIC*, however, went on to note that the issue of fraud may be summarily adjudicated if the general principles underlying summary judgment apply and cited a recent case in which it had approved a district court's grant of partial summary judgment resolving issues of fraud. *Id.* at 1334–35. Further, the court in *FDIC* affirmed the district court's grant of summary judgment on the allegations of fraud before it. *Id.* at 1336; *see also Gert v. Elgin National Industries*, 773 F.2d 154, 157–59 (7th Cir.1985) (affirming district court's grant of summary judgment because the evidence was insufficient to support a finding of intent to deceive).

Wisconsin recognizes three different torts of misrepresentation: fraudulent misrepresentation,[1] negligent misrepresentation and strict responsibility for misrepresentation. *See Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 24, 288 N.W.2d 95, 99 (1980). Fraudulent misrepresentation is established by proving three elements. First, the plaintiff must show that a false misrepresentation was made.[2] *See Ma v. Community Bank*, 494 F.Supp. 252, 258 (E.D. Wis.1980), *aff'd in part and rev'd in part*, 686 F.2d 459 (7th Cir.1982); *Ollerman*, 94 Wis.2d at 25, 288 N.W.2d at 99; *Whipp v. Iverson*, 43 Wis.2d 166, 169–70, 168 N.W.2d 201, 203–04 (1969). Second, the plaintiff must show that the statement was made with intent to deceive and to induce the plaintiff to act upon it and that the defendant either knew that the statement was false or made the statement with reckless disregard for its truth or falsity. *See Ma*, 494 F.Supp. at 258; *Ollerman*, 94 Wis.2d at 25, 288 N.W.2d at 99; *Whipp*, 43 Wis.2d at 169, 168 N.W.2d at 203–04. Third, the plaintiff must have relied upon the representation to her detriment. *See Ma*, 494 F.Supp. at 258; *Ollerman*, 94 Wis.2d at 25,

---

1. Fraudulent misrepresentation has also been called deceit or intentional deceit. *See Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 24, 288 N.W.2d 95, 99 (1980).

2. The plaintiff does this by showing that the representation was of a fact, was made by the defendant and was untrue. *See Ollerman*, 94 Wis.2d at 25, 288 N.W.2d at 99; *Whipp v. Iverson*, 43 Wis.2d 166, 169–70, 168 N.W.2d 201, 203–04 (1969).

288 N.W.2d at 99; *Whipp*, 43 Wis.2d at 169, 168 N.W.2d at 203–04.

The district court granted summary judgment for Voith on the fraudulent misrepresentation claim because there was no evidence to show that Valley had knowingly or recklessly misrepresented the facts to Bergstrom. With respect to the second requirement noted above—the requirement of scienter—earlier Wisconsin decisions have shed considerable light. For example, in *Whipp v. Iverson*, 43 Wis.2d 166, 168 N.W.2d 201 (1969), the Supreme Court of Wisconsin explained:

> At law in the action for deceit the basis of responsibility for misrepresentation was intention, generally called scienter or the intent to deceive. This elusive state of mind may be proved by proof the speaker believes his statement to be false or the representation is made without any belief as to its truth. *See Derry v. Peek* (1889), 14 A.C. 337; Restatement, 3 *Torts*, p. 63, sec. 526(b). As Prosser puts it, "A defendant who asserts a fact as of his own knowledge, or so positively as to imply that he has knowledge, under circumstances where he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have the intent to deceive...."

*Whipp*, 43 Wis.2d at 168–69, 168 N.W.2d at 202–03 (footnotes omitted). *Graff v. Tinkham*, 202 Wis. 141, 148, 231 N.W. 593, 596 (1930), held that: "If the defendant disclosed the source of his information and had no knowledge of the falsity of such information, or, not knowing it to be true, did not fraudulently or recklessly make the representation that it was true, or if both parties were equally informed, then the defendant would not be liable."

Plaintiff argues that it produced ample evidence that Valley knowingly or recklessly made misrepresentations to Bergstrom. It argues that Valley made misrepresentations "(a) while knowing that it had no basis to have repeatedly said that the pulleys were ductile iron, (b) while knowing that Lawton's letter and test results did not pertain to Bergstrom's pulleys, and (c) while knowing that the Kawin test results showed Lawton had previously failed to make satisfactory ductile iron." Appellant's Brief at 34.

 Plaintiff argues that Reynolds represented to plaintiff on the telephone and in his letter that the pulleys were made of ductile iron. Reynolds admittedly had no personal knowledge about the composition of the pulleys. His knowledge was based upon the fact that Valley had ordered ductile iron from Lawton, upon information received from Lawton and (in light of these two pieces of information) upon the absence of any information that would indicate that the pulleys were *not* made of ductile iron. We agree with the district court that the record shows that Bergstrom did not rely on any statements made during the November 1964 telephone conversation. Ross was not satisfied with the oral assurances and requested written assurances. Any oral assurances were superseded by the written information. Reynolds' letter to Bergstrom merely states that Lawton's letter indicates that the pulleys are made of ductile iron. Lawton's letter and the Kawin reports were enclosed. Thus Valley was merely forwarding information from Lawton. The plaintiff does not claim that Valley knew that the information was false. *Graff v. Tinkham*, 202 Wis. 141, 148, 231 N.W. 593, 596 (1930), holds that the necessary scienter is not present when the defendant discloses the source of its information and has no knowledge of the falsity of this information.

 Further, even if Valley were viewed as having made an independent representation that the pulleys were made of ductile iron, upon which Bergstrom relied, there is no evidence from which the necessary scienter could be reasonably inferred. A statement is made with reckless disregard for its truth or falsity when the "speaker believes his statement to be false or the representation is made without any belief as to its truth." *Whipp v. Iverson*,

43 Wis.2d 166, 168, 168 N.W.2d 201, 203 (1969). Valley obviously had reason to believe that the pulleys were made from ductile iron and there is no allegation that it did not so believe. There is no requirement that the belief be based on first-hand knowledge, as Glatfelter apparently argues. Valley was not required to conduct its own tests on the pulleys to verify that they were made from ductile iron. The plaintiff argues that Valley's knowledge that the test results submitted by Lawton could not involve the batch of metal used in the pulleys and that the failure of the batch tested to meet one of the industry standards[3] should have put Valley on notice that further investigation was appropriate. These questionable circumstances, however, involve the possibility of negligence. They do not involve the possibility of intentional or reckless misrepresentations.

■ Plaintiff's second argument against the grant of summary judgment is that Reynolds specifically made the connection between the Lawton documents and the Bergstrom pulleys despite his knowledge that the Kawin tests were not performed on those pulleys. Plaintiff refers to the statements "their letter indicates the pulleys on your machine are constructed of ductile iron with a design tensile strength of 60,000 pounds" and "their metallurgical report shows the actual tensile is between 91,370 pounds and 97,360 pounds, which means the material is considerably stronger than designed." Again we think that the plaintiff could not have shown that the statements were made either knowing they were false or with reckless disregard for their truth or falsity because Valley was merely passing information from Lawton

3. The elongation percentages of the ductile iron tested were less than those called for by ASTM standards. Plaintiff does not claim, however, that the contract required the pulleys to meet ASTM standards or that this characteristic would affect the pulleys' strength.

4. A Pierringer release releases the settling tort-feasor from all future liability and assures that the settling tort-feasor could not be made a

to Bergstrom, and Valley's letter did not purport to do anything more. The fact that Valley realized that the tests were not performed on the pulleys in question does not affect our conclusion, because neither Lawton's letter nor Reynolds' letter explicitly claims that the tests were performed on the Bergstrom pulleys. Rather, Lawton's letter indicates that the tests were performed on its "60,000# tensile ductile type iron." Valley passed along the information from Lawton because it believed that the pulleys were constructed from "60,000# tensile ductile type iron."

### III.

■ Glatfelter's second argument on appeal is that the district court incorrectly ruled that Glatfelter can recover judgment against Voith for only thirty percent of its out-of-pocket damages.

The district court reasoned that Voith and Lawton were jointly liable only for out-of-pocket expenses, and that it would be unjustifiable to make Voith pay more than thirty percent of that amount because Voith is precluded by the Pierringer release from pursuing any cause of action for contribution against Lawton.[4] Glatfelter argues that judgment should be entered against Voith in the amount of $54,164, the entire amount of the damage award for out-of-pocket expenses. Plaintiff reasons as follows:

The jury determination that the combined conduct of Valley and Lawton caused Glatfelter to suffer damages totalling $686,601 [sic]. The jury found Valley to be responsible for 30% of this injury. Under normal Wisconsin principles of comparative negligence, following

party defendant in any action brought against non-settling tort-feasors. The plaintiff is limited in recovery to the unsatisfied percentage of the damages—the percentage attributable to the non-settling tort-feasors. See *Swanigan v. State Farm Insurance Co.*, 99 Wis.2d 179, 197–98, 299 N.W.2d 234, 243 (1980); *Peiffer v. Allstate Insurance Company*, 51 Wis.2d 329, 335–36, 187 N.W.2d 182, 185 (1971).

settlement with Lawton, Voith would have owed Glatfelter $205,080.30. However, if the summary judgment ruling insulating Voith from lost profits damages were correct, Glatfelter's recovery against Voith would be limited to the amount of Glatfelter's out-of-pocket losses, or $54,164.

Appellant's Brief at 40.

The flaw in plaintiff's reasoning is that it assumes that Voith and Lawton were jointly liable for plaintiff's total damages and that the partial summary judgment only limited Voith's liability *to an amount* not exceeding out-of-pocket losses. We think that the correct view is that under the contract, as interpreted by the partial summary judgment order, Voith was at no time liable for Glatfelter's lost profits.[5] Therefore the amount of damages awarded by the jury for lost profits is irrelevant to the 70%/30% calculation. *See Bielski v. Schulze,* 16 Wis.2d 1, 13, 17, 114 N.W.2d 105, 111, 113 (1962) (Wisconsin's theory of comparative negligence allocates comparative liability for damages only in situations in which there exists joint liability). In light of Lawton's settlement with the plaintiff, the amount of lost profits determined by the jury is mere surplusage and should be ignored. Thus the jury's allocation of causal negligence should be applied only to the damage for out-of-pocket expense, because this is the only claim for which Voith was jointly liable. The district court judge correctly entered judgment against Voith in the amount of $16,249.20.[6]

AFFIRMED

5. The contract provided: "Valley *shall not be liable* in any event for loss of anticipated profits, loss by reason of plant shutdown, non-operation or increased expense of operation of other equipment, or other consequential loss or damage of any nature." (Emphasis supplied.)

6. The plaintiff argues that if "Lawton had stayed in the case through verdict, the district court's decision would have effectively saddled Lawton with responsibility for almost 98% of the total damages of $683,601. It would plainly be unjust to impose 98% of the damage burden on a party found 70% responsible." Appellant's Brief

at 42. We do not know how plaintiff arrived at this 98% figure, or if plaintiff's assertion is correct. The district court did correctly note that "had the eleventh hour settlement not been negotiated, the only amount for which the two defendants were jointly liable—namely, the 'out-of-pocket' losses totaling $54,164.00—would have been paid pursuant to the 30%–70% causal assessment." District Court Opinion at 8. Thus Voith would have been liable only for $16,-249.20. Clearly it would be irrational for Lawton's settlement with the plaintiff to increase Voith's liability.