**In re WIN–VENT, INC., Debtor.**

**COMMERCE BANK, N.A., formerly Commerce Bank of Springfield, N.A., Plaintiff,**

**v.**

**TIFTON ALUMINUM COMPANY, INC., and Fred Charles Moon, Trustee of the Estate of Win–Vent, Inc., Defendants.**

**Bankruptcy No. 93–60637.
Adversary No. 93–6041.**

United States Bankruptcy Court,
W.D. Missouri,
Southern Division.

May 19, 1997.

Thomas J. O'Neal, Shughart, Thomson & Kilroy, Springfield, MO, for Plaintiff.

William A. Dalton, City Utilities, Springfield, MO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KAREN M. SEE, Bankruptcy Judge.

This memorandum opinion rules all issues in this adversary action. **Part A.** consists of findings and conclusions on issues taken up at a hearing three days before trial on Commerce Bank's Motion for Summary Judgment on defendant Tifton Aluminum Company's First Amended Counterclaim, and Tifton's Motion to Dismiss First Amended Counterclaim Without Prejudice, filed in response to the motion for summary judgment. **Part B.** of this memorandum consists of findings and conclusions for the trial. The court has jurisdiction over this core proceeding and may enter final orders pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B), (E), (K), (M) and (O).

### A.

### ORDER DENYING DEFENDANT TIF-TON'S MOTION TO DISMISS COUN-TERCLAIM WITHOUT PREJUDICE AND ENTERING PARTIAL SUM-MARY JUDGMENT

**Defendant Tifton Aluminum Company filed a counterclaim against** plaintiff Commerce Bank on the following theories: Count I, Equitable Lien; Count II, Fraudulent Misrepresentation; Count III, Negligent Misrepresentation; Count IV, Lien Priority, and; Count V, Unjust Enrichment. Commerce Bank filed a motion for summary judgment on Tifton's counterclaim. In response, Tifton filed a motion to dismiss the counterclaim without prejudice.

Both motions were set for hearing on December 3, 1993, three days before the trial in this adversary action. Appearances were: Commerce by attorneys Thomas J. O'Neal and Richard A. Heider; Tifton by attorneys William A.R. Dalton and B.H. Clampett; and Fred C. Moon, bankruptcy trustee of the estate of Debtor Win–Vent, Inc., by attorney Timothy J. Harris. After reviewing the pleadings, arguments and authority, the court finds that Tifton's motion to dismiss its counterclaim without prejudice should be denied, and Commerce's motion for summary judgment on Tifton's counterclaim should be granted as to Counts I, II, III, and IV.

Summary judgment will not be entered on Count V because it involves many of the same facts and issues as Commerce's complaint. Accordingly, Count V will be determined at trial.

Preliminary findings and conclusions made on the record at the conclusion of the hearing on summary judgment and on Tifton's motion to dismiss without prejudice, which was filed in response to the motion for summary judgment. The preliminary oral findings and conclusions may be supplanted in certain respects by these written findings and conclusions, made after further consideration of the issues and the record.

### I. FACTS

Debtor Win–Vent, Inc. originally filed a Chapter 11 case, which was eventually converted to Chapter 7. Before bankruptcy, Debtor manufactured aluminum windows at its plant in Nixa, Missouri. Tifton Aluminum Company, Inc. makes aluminum extrusions at its plant in Tifton, Georgia and supplied this product to Debtor for use in manufacturing the windows.

Debtor is obligated to Commerce Bank of Springfield, Missouri under three promissory notes. By September 1990, Commerce had loaned approximately $1.5 million to Debtor. Commerce filed a proof of claim in this case for $1,180,049.08, the remaining balance on the notes. On January 29, 1990, Debtor executed two security agreements in favor of Commerce. On June 8, 1988, June 9, 1988, February 2, 1990 and February 5, 1990, Commerce perfected the security interests by filing four separate UCC–1 statements with the Missouri Secretary of State and the Recorder of Deeds for Christian County, Missouri. Consequently, Commerce held security interests in virtually all of Debtor's assets, including its inventory, accounts receivable, proceeds of accounts receivable, furniture, equipment, and intangibles. The three notes were also guaranteed by Oren Goble, Debtor's president. Mr. Goble's guarantee was secured by a second deed of trust on his real property.

In September 1990, Commerce's representatives informed Debtor that Commerce did

not want to continue as Debtor's lender, and that it wanted Debtor to find another lender and pay off the notes to Commerce. Debtor was unable to find another lender. On July 15, 1991, all three of Debtor's notes matured. On December 17, 1991, Commerce demanded payment of the balance due on the notes.

Since 1985, Tifton supplied Debtor with a significant amount of aluminum extrusions, which constituted the majority of the raw material used in Debtor's business. In December 1990, Debtor was delinquent on its Tifton account. Tifton and Debtor determined that 30–31% of the cash collected from inventory sales was allocable to the aluminum extrusions supplied by Tifton. Therefore, the two companies agreed in January 1990 that Tifton would continue to supply aluminum extrusions to Debtor if Debtor agreed to pay 30–31% of its receivables to Tifton on a weekly basis. In November 1992, Tifton began requiring Debtor to pay cash on delivery for the aluminum extrusions shipped.

Commerce was aware of Debtor's arrangement with Tifton. On February 5, 1991, Commerce wrote Debtor and detailed arrangements to extend credit to debtor for 90 days. The letter contained a provision that allowed Debtor to continue paying Tifton approximately 31% of Debtor's cash collections. The letter asserted that debtor was not to allow the agreement to impair Commerce's collateral. Further, the letter stated that the consent is conditioned on debtor and Tifton's clear understanding "that the bank is not allowing a security interest to be taken in the proceeds of the bank's collateral."

On December 30, 1991, Debtor filed an action against Commerce in state court seeking to enjoin Commerce from collecting on Debtor's obligations. On January 14, 1992, the state court granted a temporary injunction, with the parties' consent, to allow Debtor to obtain other financing. The order required Debtor to enter into a cash collateral agreement creating an account at Commerce into which Debtor would deposit all cash collected from sales. If Debtor failed to satisfy its obligations to Commerce by March 30, 1992, Debtor was to turn over all of its loan collateral to Commerce. Debtor sought, but was denied, an extension of the temporary injunction. Tifton was aware of the terms of the temporary injunction and of Debtor's failure to obtain an extension of the order.

On July 27, 1992, Commerce's attorney sent a letter to Debtor's attorneys again demanding the turnover of all collateral and all proceeds of the collateral. The letter also states that Commerce denied Debtor permission to use the cash collateral account to pay its obligations to Tifton. On September 9, 1992, the state court found Debtor in contempt of court for failing to turn over the collateral to Commerce pursuant to the state court order entered January 14, 1992.

On August 17, 1992 the state court granted Tifton's motion to intervene in the state court lawsuit to assert its claim for an equitable lien on Debtor's inventory to the extent of the raw materials supplied by Tifton. On August 26 and 31, 1992, Tifton purported to perfect two security interests in all aluminum products and the proceeds of these products furnished by Tifton.

## II. MOTION TO DISMISS WITHOUT PREJUDICE

■ In response to Commerce's motion for summary judgment, Tifton filed a motion to dismiss its counterclaim without prejudice. The court finds that, pursuant to Bankruptcy Rule 7041 and Fed.R.Civ.P. 41, dismissal of Tifton's counterclaims without prejudice should not be permitted at this stage in the proceeding, three days before trial and in the face of Commerce's motion for summary judgment. Dismissal under these circumstances would create an undue hardship for the parties, who have spent a significant amount of time and resources preparing for trial and the summary judgment hearing on the issues presented in the counterclaim. Accordingly, Tifton's motion to dismiss its counterclaims without prejudice is denied.

## III. SUMMARY JUDGMENT

### A. TIMELINESS AND NOTICE

■ Tifton contends that Commerce filed its motion for summary judgment in order to interfere with Tifton's trial preparation.

Commerce argues that a ruling on the motion for summary judgment prior to trial would reduce the evidence and streamline the issues at trial.

One of the primary purposes of Rule 56 is to secure a just, speedy and inexpensive determination of every action by isolating and disposing of factually unsupported claims. *Celotex Corporation v. Catrett*, 477 U.S. 317, 327–29, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223, 225 (8th Cir.1990). The court agrees with Commerce that deciding certain issues at the summary judgment hearing will simplify the case and reduce the length and expense of trial. Tifton's summary judgment preparations addressed the same issues involved at trial scheduled for three days later. The summary judgment motion did not raise any additional or different issues from those Tifton was already working on. Furthermore, the court notes that Tifton's preparation for the hearing on the summary judgment was minimal because Tifton did not dispute any of the facts asserted by Commerce. Rather, Tifton responded to the summary judgment motion with a motion to dismiss its counterclaim without prejudice on the eve of trial.

Tifton also contends it did not receive proper notice of Commerce's motion for summary judgment. A motion for summary judgment must be served at least 10 days before the time fixed for the trial. Fed. R.Civ.P. 56(b). Commerce filed the motion on November 18, 1993, 18 days before the trial date of December 6, 1993. Commerce served the parties by mail on November 16, 1993, 20 days before trial. The court finds that Commerce's motion was timely served and filed.

## B. MERITS OF THE SUMMARY JUDGMENT MOTION

### 1. GENERAL

Summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Postscript*, 905 F.2d at 225. Entry of summary judgment is mandated against a party who fails to sufficiently establish an essential element of that party's case on which the party bears the burden of proof at trial. *Celotex*, 477 U.S. at 320–23, 106 S.Ct. at 2552.

In the present case, Tifton's response to Commerce's Motion for Summary Judgment consisted primarily of legal argument. Tifton failed to establish a factual dispute in its response to the summary judgment motion, despite its affirmative obligation to do so. Because Tifton has failed to establish necessary elements of Counts I, II, III, and IV of its counterclaim, entry of summary judgment is mandated against Tifton on these claims.

### 2. Count I: Equitable Lien

In Count I of its counterclaim, Tifton seeks imposition of an equitable lien because Tifton continued to supply raw materials to Debtor so that it could remain in business, allegedly at the request of both Commerce and Debtor. Tifton also alleges that Debtor was able to make payments on its indebtedness to Commerce because Tifton continued to supply Debtor. Finally, Tifton alleges that both Commerce and Debtor agreed with Tifton that it should get 31% of the accounts receivable and an equitable lien on the raw materials, finished products and the accounts receivable.

An equitable lien is a remedial mechanism that may attach to property in order to secure payment of an existing obligation. *Fredco Realty, Inc. v. Jones*, 906 S.W.2d 818, 822 (Mo.Ct.App.1995); *Dave Kolb Grading, Inc. v. Lieberman Corp.*, 837 S.W.2d 924, 930–931 (Mo.Ct.App.1992). The elements of an equitable lien are: 1) a duty or obligation owed by one person to another; 2) a res to which that obligation fastens and which can be identified; and 3) an intent, express or implied, that the property serve as security for the payment of the debt or obligation. *Fredco*, 906 S.W.2d at 822; *Dave Kolb*, 837 S.W.2d at 931; *Iota Management Corp. v. Boulevard Inv. Co.*, 731 S.W.2d 399, 420 (Mo.Ct.App.1987).

Tifton contends that its claim for imposition of an equitable lien, which re-

quires a determination of intent, is inappropriate for summary judgment because the court will not have an opportunity to observe witnesses' demeanor. Summary judgment is usually inappropriate where the inferences the movant seeks to draw involve questions of motive, intent, and subjective feelings. *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535, 540 (2nd Cir.1987); *P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir.1986); *SEC v. Feminella*, 947 F.Supp. 722, 730 (S.D.N.Y.1996). Such issues, however, may be summarily adjudicated if the general principles of summary judgment apply. *Voith*, 784 F.2d at 774. Where there is insufficient evidence to support a finding of intent or motive, summary judgment is appropriate. *Id.* at 774–776; *Gert v. Elgin National Industries*, 773 F.2d 154, 157–159 (7th. Cir.1985).[1]

■ Imposition of an equitable lien is an extraordinary remedy and the facts of the present case do not support such measures.[2] Specifically, Tifton's argument in favor of the equitable lien fails because Tifton has failed to satisfy the elements of duty or intent necessary for imposition of an equitable lien. Specifically, at the time of Debtor's alleged commitment to Tifton, there was no debt or obligation between Tifton and Commerce. The only obligation owed to Tifton was that of the Debtor. Furthermore, there is no evidence that Commerce communicated an intent to Tifton to allow proceeds from Debtor's accounts receivable, in which Commerce held a perfected security interest, to act as security on any obligation to Tifton.

■ Even if Tifton could establish the basis for an equitable lien, which the court holds it has not, § 544 of the Bankruptcy Code grants Debtor or the bankruptcy trustee the absolute right to cut off unperfected interests, such as this alleged equitable lien. 11 U.S.C. § 544 (1994). If the alleged equitable lien is not effective as to Debtor, it could not be effective as to Commerce. Entry of summary judgment is required with respect to Count I of Tifton's counterclaim.

### 3. Counts II and III: Fraudulent and Negligent Misrepresentation

■ In Counts II and III, Tifton alleges Commerce made representations to Tifton that were either fraudulent or negligent. Tifton again argues that entry of summary judgment is inappropriate on these two counts because both claims involve determinations of intent. The elements of fraudulent misrepresentation, which is Count II of Tifton's complaint, are: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity, or ignorance of its truth; 5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of the falsity of the representation; 7) reliance by the hearer on the truth of the representation; 8) a right to rely thereon; and 9) consequent injury proximately caused to the hearer. *See, e.g., United States ex rel Bussen Quarries, Inc. v. Thomas*, 938 F.2d 831, 833 (8th Cir.1991); *Norden v. Friedman*, 756 S.W.2d 158, 164 (Mo.1988); *Hewlett v. Hewlett*, 845 S.W.2d 717, 719 (Mo.Ct.App.1993).

■ The elements of Count III of Tifton's counterclaim for negligent misrepresentation are: 1) that defendant supplied information in the course of his business or

---

1. Although a state court case is not controlling authority in a summary judgment proceeding in federal court, the Missouri Supreme Court decision in *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371 (Mo.1993) is instructive in the present case, especially in light of Tifton's heavy reliance on state law to establish its claims. *ITT* directs that use of summary judgment should be expanded in cases similar to this controversy where a suit on a promissory note is potentially converted into a fraud case by the filing of a counterclaim for fraud or misrepresentation. *ITT*, 854 S.W.2d at 387–389. This court agrees with the Missouri Supreme Court that it is inappropriate to convert a promissory note case into a fraud claim on facts such as are present here.

2. In the context of a bankruptcy proceeding, an equitable lien should be looked at in the same light as other extraordinary equitable remedies, such as a constructive trust, which is disfavored because it would treat a single creditor differently, in contravention of the bankruptcy principle that all similarly situated creditors should be treated alike. *See, e.g., Shubert v. Jeter*, 171 B.R. 1015 (Bankr.W.D.Mo.1994), *aff'd* 73 F.3d 205 (8th Cir.1996).

because of some other pecuniary interest; 2) that because of a failure by defendant to exercise reasonable care or competence, the information was false; 3) that the information was intentionally provided by defendant for the guidance of a limited group, including plaintiffs, in a particular business transaction; and 4) that in relying on the information, plaintiffs suffered a pecuniary loss. *Clayton X–Ray Co. v. Evenson,* 826 S.W.2d 45, 48 (Mo.Ct.App.1992).

As stated in the discussion of Tifton's equitable lien claim, summary judgment is usually inappropriate where the movant seeks to draw inferences involving questions of intent, but may be entered if the general principles of summary judgment apply. *Voith,* 784 F.2d at 774. Again, where there is insufficient evidence to support a finding of intent, summary judgment is appropriate. *Id.* at 774–776; *Gert,* 773 F.2d at 157–159.

■ The evidence shows that Commerce did not make any representations to Tifton. The only communication from Commerce that referenced the 31% agreement was a letter to Debtor. The deposition testimony of Tifton's representatives indicate that little or no communication existed between Commerce and Tifton at the time Debtor and Tifton discussed the 31% agreement. Moreover, Tifton had not referenced any representation made from Commerce to Tifton. A letter to Debtor is not a representation to Tifton. If Commerce made no representations to Tifton, Commerce could not communicate any intent to Tifton regarding the 31% agreement. There is not evidence Commerce made any representation to Tifton in writing or otherwise. Tifton, therefore, failed to establish the elements of representation and intent necessary to prove its claims for fraudulent and negligent misrepresentation. Accordingly, Commerce is entitled to summary judgment in its favor on Counts II and III.

### 4. Count IV: Lien Priority

■ Tifton claims that it has priority on the raw materials it supplied because it retained security interests under the purchase money security interest provisions of Missouri's Uniform Commercial Code. Tifton and

Debtor executed security agreements on August 21, 1992 and Tifton filed financing statements on August 26, 1992 and August 31, 1992.

Commerce argues that no security interest attached to the raw materials supplied by Tifton because the security agreements do not contain a description of the collateral. Under Mo.Rev.Stat. § 400.9–203(1), a security interest is not enforceable and does not attach unless:

> (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral. . . .

The security agreements executed between Debtor and Tifton include spaces in which to identify the Debtor, the name of the secured party and a description of the collateral. These boxes, however, are blank. Because Tifton failed to execute a security agreement containing a description of the collateral that complied with Missouri law, Tifton does not have an enforceable security interest.

■ Commerce further argues that even if Tifton has a security interest in the raw materials, it is not a purchase money security interest under Missouri law because the interest secures antecedent debts. Missouri statute defines a purchase money security interest as one "taken or retained by the seller of the collateral to secure all or part of its price." Mo.Rev.Stat. § 400.9–107(a) (Vernons 1992). A purchase money security interest cannot exceed the price of what is purchased in the transaction giving rise to the security interest. *See e.g., In re Manuel,* 507 F.2d 990, 993 (5th Cir.1975); *In re Oszajca,* 199 B.R. 103, 112 (Bankr.D.Vt.1996); *Matter of Hillard,* 198 B.R. 620, 622 (Bankr. N.D.Ala.1996); *In re Wilson,* 25 B.R. 276, 278 n. 4 (Bankr.D.Neb.1982); *Matter of Johnson,* 15 B.R. 681, 685 (Bankr.W.D.Mo. 1981).

The Tifton security agreements secure "payment of [debtor]'s promissory notes, now or hereafter executed, made payable to [Tifton], and to secure payment and performance of all other debts, liabilities and obligations of [debtor] to [Tifton], now existing or hereafter

incurred, ... the payment of promissory notes executed pursuant to the Security Agreement and ... the payment and performance of all other obligations and indebtedness of whatever kind and whenever created of [Win–Vent] and [Tifton]." This language is very broad and indicates that Tifton attempted to create a security interest in all collateral whenever acquired, including obligations owed prior to the execution of the security agreements. Additionally, Howard Ray Heileson, Tifton's Manager of Credit and Procurement Services, admitted in his deposition that Debtor owed Tifton over $1,100,000 in antecedent debt. The evidence also indicates that Tifton placed Debtor on a C.O.D. basis at the same time it filed its financing statements and required Debtor to pay for raw materials in full immediately after accepting them. Therefore, there was no debt to secure with the purchase money security interest other than the antecedent debt.

■ Finally, Commerce argues that as a holder of a conflicting security interest in the same collateral, it did not receive proper written notice that Tifton was asserting a purchase money security interest. A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if:

(1) It is perfected at the time the debtor gets *possession* of the collateral (the filing must take place before the inventory is delivered to the debtor); and

(2) Any secured party who has perfected its security interest on the same collateral receives *written notification* of the purchase money security interest before the debtor receives possession of the inventory, and the notification states that the purchase money party has or expects to take a purchase money security interest in inventory of the debtor described by kind or type.

Mo.Rev.Stat. Ann. § 400.9–312(3) (Vernons 1992) [emphasis added].

Counsel for Tifton sent a letter dated September 9, 1992 to counsel for Commerce, which Tifton relies upon in arguing that it satisfied the written notice requirement of Missouri law. Contrary to Tifton's asser-

tions, the letter fails for two reasons. First, the letter does not mention that Tifton is asserting a purchase money security interest. Second, counsel for Commerce did not receive the letter before Debtor took possession of the inventory. Tifton, therefore, failed to properly notify Commerce of its alleged purchase money security interest pursuant to § 400.9–312(3).

Tifton does not have a purchase money security interest in Debtor's inventory and Commerce perfected its security interest prior to any interest claimed by Tifton. Accordingly, Commerce will be granted summary judgment on Count IV.

### 5. Count V: Unjust Enrichment

Tifton claims in Count V of its counterclaim that Commerce retained a benefit from raw materials Tifton supplied to Debtor and that, as a result, Commerce has been unjustly enriched. The doctrine of unjust enrichment in Missouri is as follows:

After determining that one has received benefits at the expense of another, the court then seeks to determine whether or not it would be unjust to permit the enriched party to retain the benefits. In making this determination, the court uses equitable principles in considering the various factors surrounding the relationship such as change of position, hardship, unreasonable delay, unclean hands, bad faith and other equitable principles of defense.

*Farmers New World Life Ins. Co. v. Jolley*, 747 S.W.2d 704, 705 (Mo.Ct.App.1988).

Most courts do not allow prosecution of an unjust enrichment claim as a mechanism to alter Article 9 priorities in the absence of actual fraud. *See, e.g., Peerless Packing Co. v. Malone & Hyde, Inc.*, 180 W.Va. 267, 376 S.E.2d 161 (1988); *Evans Products Co. v. Jorgensen*, 245 Or. 362, 421 P.2d 978 (banc 1966). The courts that have allowed such claims have done so only in very limited situations. In *Borg–Warner Acceptance Corp. v. Valentine Associates Limited Corp.*, 192 Ga.App. 123, 384 S.E.2d 223 (1989), the court allowed an unjust enrichment claim where the secured creditor had been unjustly enriched due to a mistaken payment by a

second creditor of the debtor. *Borg–Warner,* 384 S.E.2d at 224. In *Ninth District Production Credit Ass'n v. Ed Duggan, Inc.,* 821 P.2d 788 (Colo. banc 1991), the secured creditor "was the source of all operational funds for [the debtor's] operations, controlled payment of all of its obligations, and received the proceeds of all of its accounts receivable." *Duggan, Inc.,* 821 P.2d at 798. The secured creditor had allowed the debtor's business to continue in order to sell it as a going concern and was aware of each order placed with the supplier, who received no payments during that period, and all proceeds of accounts receivable were deposited into an escrow account. The court held that equity required the secured creditor to compensate the unsecured creditor who had supplied the benefit.

In this case, there are no allegations involving mistaken payments but there are factual questions similar to those posed in Commerce's claim for conversion. Thus, there are genuine issues of material fact relating to Count V and, therefore, entry of summary judgment is not appropriate with respect to this count of Tifton's counterclaim. Count V will be decided at trial.

## IV. CONCLUSION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS COUNTERCLAIM WITHOUT PREJUDICE

Defendant Tifton's Motion to Dismiss First Amended Counterclaim Without Prejudice is denied. Summary judgment is entered in favor of Commerce on Counts I, II, III and IV of Tifton's counterclaim because there are no material facts in dispute on those counts and, therefore, Commerce is entitled to judgment as a matter of law. Summary judgment will not be granted on Count V of the counterclaim. Count V will be decided at trial.

3. After hearing the evidence on the unjust enrichment claim, the court finds no reason to upset its prior ruling on the first four counts of Tifton's counterclaim. Additionally, Count I of Commerce's First Amended Complaint seeks a declaratory judgment stating that Commerce's

## B.

## FINDINGS, CONCLUSIONS AND ORDER AFTER TRIAL ON COUNT II OF COMPLAINT AND COUNT V OF COUNTERCLAIM

Plaintiff Commerce Bank, N.A. filed this action seeking declaratory relief and to determine the liability of Defendant Tifton Aluminum Company, Inc. for conversion of its collateral. Tifton counterclaimed in five counts, four of which the court previously adjudicated on summary judgment. Trial was held on December 6, 1993 on Commerce's conversion claim and Tifton's unjust enrichment counterclaim. After review and analysis of the evidence and the pertinent authorities, the court finds for Commerce and against Tifton on the conversion claim and the unjust enrichment counterclaim.[3]

### I. FACTS

On June 28, 1993, Debtor Win–Vent, Inc. filed a Chapter 11 case, which was eventually converted to Chapter 7. Before bankruptcy, Debtor manufactured aluminum windows at its plant in Nixa, Missouri. Tifton Aluminum Company, Inc. makes aluminum extrusions at its plant in Tifton, Georgia and supplied this product to Debtor for use in manufacturing the windows.

Debtor is obligated to Commerce Bank, N.A., under three promissory notes. By September 1990, Commerce had loaned approximately $1.5 million to Debtor. Commerce filed a proof of claim in this case for $1,180,049.08, the remaining balance on the notes. On January 29, 1990, Debtor executed two security agreements in favor of Commerce. On June 8, 1988, June 9, 1988, February 2, 1990 and February 5, 1990, Commerce perfected the security interests by filing four separate UCC–1 statements with the Missouri Secretary of State and the Recorder of Deeds for Christian County, Missouri. Consequently, Commerce held security interests in virtually all of Debtor's

interest in the collateral for its loans is superior to that of Tifton or the Trustee. The court resolved this issue pursuant to the ruling made at the December 3, 1993 hearing on the motion for summary judgment. The court will enter judgment accordingly.

assets, including its accounts receivable and proceeds of accounts receivable. The three notes were also guaranteed by Oren Goble, Debtor's president. Mr. Goble's guarantee was secured by a second deed of trust on his real property.

In September 1990, Commerce's representatives informed Debtor that Commerce did not want to continue as Debtor's lender, and that it wanted Debtor to find another lender and pay off the notes to Commerce. Debtor was unable to find another lender. On July 15, 1991, all three of Debtor's notes matured. On December 17, 1991, Commerce demanded payment of the balance due on the notes.

Since 1985, Tifton supplied Debtor with a significant amount of aluminum extrusions, which constituted the majority of the raw material used in Debtor's business. In December 1990, Debtor was delinquent on its Tifton account. Tifton and Debtor determined that 30–31% of the cash collected from inventory sales was allocable to the aluminum extrusions supplied by Tifton. Therefore, the two companies agreed in January 1990 that Tifton would continue to supply aluminum extrusions to Debtor if Debtor agreed to pay 31% of its receivables to Tifton on a weekly basis. In November 1992, Tifton required Debtor to pay cash on delivery for the aluminum extrusions shipped.

Commerce was aware of Debtor's arrangement with Tifton. On February 5, 1991, Commerce wrote Debtor and detailed arrangements to extend credit to debtor for 90 days. The letter contained a provision that allowed Debtor to continue paying Tifton approximately 31% of Debtor's cash collections. The letter asserted that Debtor was not to allow the agreement to impair Commerce's collateral. Further, the letter stated that the consent is conditioned on Debtor and Tifton's clear understanding "that the bank is not allowing a security interest to be taken in the proceeds of the bank's collateral."

Tifton was likewise aware of Commerce's dealings with Debtor. Leslie Jack O'Connor, Tifton's controller, testified that he knew Commerce was Debtor's "sole bank." Further, he was aware that Commerce held a perfected security interest in virtually all of Debtor's assets, including the aluminum extrusions shipped to Debtor. In September 1990, Ray Heileson, Tifton's Manager of Procurement and Credit Services, met with Mr. Goble and Cliff Ricketts, an officer of Commerce, to discuss how Debtor could satisfy its obligation to Commerce and remain in business. Mr. Heileson testified that Debtor advised him that Commerce wanted Debtor to find another lender and demanded payment of its notes.

On December 30, 1991, Debtor filed an action against Commerce in state court seeking to enjoin Commerce from collecting on Debtor's obligations. On January 14, 1992, the state court granted a temporary injunction, with the parties' consent, to allow Debtor to obtain other financing. The order required Debtor to enter into a cash collateral agreement creating an account at Commerce into which Debtor would deposit all cash collected from sales. If Debtor failed to satisfy its obligations to Commerce by March 30, 1992, Debtor was to turn over all of its loan collateral to Commerce. Debtor sought, but was denied, an extension of the temporary injunction. Tifton was aware of the terms of the temporary injunction and of Debtor's failure to obtain an extension of the order.

Debtor was unable to find another lender. On July 20, 1992, John Owens, Executive Vice President of Commerce, and Mike Cherry, a Commerce Vice President, arrived at Debtor's premises to confiscate the collateral pursuant to the state court order authorizing turnover after March 30, 1992. Debtor's attorney met them in the parking lot. The Commerce representatives demanded possession of the collateral. Debtor's attorney allowed them to inspect the collateral but would not allow them to take possession of it.

Debtor continued to make monthly payments on its matured loans from Commerce until July 1992. On July 27, 1992, Commerce's attorney sent a letter to Debtor's attorneys again demanding turnover of all collateral and all proceeds of the collateral. The letter also stated that Commerce denied Debtor permission to use the cash collateral account to pay its obligations to Tifton. On September 9, 1992, the state court found

Debtor in contempt of court for failing to turn over the collateral to Commerce pursuant to the state court order entered January 14, 1992.

On August 17, 1992 the state court granted Tifton's motion to intervene in the state court lawsuit to assert its claim for an equitable lien on Debtor's inventory to the extent of the raw materials supplied by Tifton. On August 26 and 31, 1992, Tifton purported to perfect two security interests in all aluminum products and the proceeds of these products furnished by Tifton. This court ruled at the summary judgment hearing that these security interests do not qualify as purchase money security interests.

In September 1992, Debtor opened another account at the First National Bank of Berryville, Arkansas. Karen Hood, Debtor's Controller, testified that Debtor moved the account in order to continue its business in the event Commerce seized the funds Debtor had on account at Empire Bank. All proceeds of accounts receivable, approximately $3 million, were deposited into the Berryville account. Debtor paid Tifton under the 31% agreement and on the note representing previous credit supplied to Debtor out of the Berryville account.

In October 1992, Debtor moved its accounting office to a separate building two blocks north of its previous location. Debtor did not place its name on the door, nor did it publish its telephone listing. Mr. Goble kept Mr. Heileson informed of the ongoing events in Debtor's dispute with Commerce. Mr. Heileson testified that he was aware of the contempt order and the order appointing a receiver after Debtor failed to turn over its assets to Commerce. A *memorandum to Mr. Heileson's file* states that Mr. Goble informed him that Debtor moved its accounting office to another location and its bank account to another state to prevent Commerce from obtaining the records if it took possession of the property.

On September 21, 1992 the bank foreclosed on the second deed of trust, which secured Mr. Goble's personal guarantee on the property rented by Debtor and owned by Mr. Goble. On October 27, 1992, the state court ordered Debtor to turnover all assets to an appointed receiver. Debtor failed to comply with this order until approximately June 4, 1993.

Debtor paid $819,055.19 to Tifton out of the Berryville bank account from September 4, 1992 until Debtor ceased operations on June 4, 1993. Commerce seeks this amount as damages on its conversion claim. Tifton seeks to set off this amount with its unjust enrichment claim, arguing that it supplied Debtor with raw materials to allow Debtor to continue operations and to satisfy its obligation to Commerce.

## II. LEGAL DISCUSSION

### A. Conversion

Conversion is the wrongful exercise of dominion or ownership over a chattel, constituting tortious interference with the right of possession. *Auto Alarm Supply Corp. v. Lou Fusz Motor Co.,* 918 S.W.2d 390, 392 (Mo.Ct.App.1996); *Ensminger v. Burton,* 805 S.W.2d 207, 210–11 (Mo.Ct.App. 1991). The state court order required Debtor to turn over to Commerce after March 30, 1992 all collateral on the loans. After this date, therefore, Commerce had the right to possess the collateral, including the identifiable proceeds of Debtor's accounts receivable deposited into the Berryville account.

*ITT Industrial Credit Co. v. H & K Machine Service Co.,* 525 F.Supp. 170 (E.D.Mo. 1981), evaluated a fact pattern similar to that under consideration. There, ITT loaned money to Southern Screw for working capital and to acquire one bar machine. ITT perfected a security interest in various items of equipment, including the bar machine, as collateral for its loan. When Southern Screw transferred the bar machine to one of its other suppliers to satisfy debts owed to that supplier, ITT alleged conversion of the machine. *ITT,* 525 F.Supp. at 171. Based on these facts, the court in *ITT* found that "an unauthorized disposition of the collateral was made and such disposition constituted a default and therefore an action in conversion will lie." *Id.*

Commerce assented to Debtor's use of a portion of the collateral to pur-

chase aluminum extrusions from Tifton for its operation. Commerce argues, however, that it revoked consent prior to the time Debtor opened the Berryville account and paid Tifton from the proceeds in which Commerce had a perfected security interest. Commerce asserts that Tifton's continued acceptance of Commerce's collateral with knowledge that consent had been revoked is conversion of Commerce collateral.

Commerce notified Debtor of its revocation of consent to use the collateral to purchase aluminum extrusions on two separate occasions. First, on July 20, 1992, Commerce's representatives went to Debtor's business and demanded all collateral pursuant to the state court order authorizing turnover after March 30, 1992. This demand included the accounts receivable. Second, on July 27, 1992, Commerce's attorney sent a letter to Debtor's attorney demanding that Debtor turnover all collateral and proceeds of collateral. These acts constitute revocation of Commerce's consent that Debtor use the collateral to purchase aluminum extrusions from Tifton.

 In response, Tifton argues that it is not liable for conversion because it did not receive notice of Commerce's revocation of consent. This argument lacks merit. Neither mistake nor good faith belief in the right to possession is a defense to a conversion claim. *ITT*, 525 F.Supp. at 172; *Ensminger*, 805 S.W.2d at 211. In this case, Tifton was aware of the demands made by Commerce upon Debtor and Debtor kept Tifton apprised of the ongoing litigation with Commerce. Therefore, Tifton had notice of Commerce's revocation of consent to use collateral even if Commerce did not directly inform Tifton of the situation.

Moreover, at the state court hearing on August 17, 1992, Commerce's attorney, Mr. O'Neal, did inform Tifton's attorney, Mr. Dalton, of Commerce's revocation of consent and its intent to assert a conversion claim against Tifton if Tifton continued to accept the collateral as payment for aluminum extrusions. Specifically, Mr. O'Neal stated:

Judge, just for the record, we certainly don't agree that Tifton does have an equitable lien, and so that Tifton will clearly

have notice of this, we have previously advised Win–Vent that it was not authorized to use the proceeds of any collateral for the bank's loan in any respect, and we fully intend to trace those proceeds if Win–Vent continues to use them, and so unless—depending on what happens today, we may well assert a counterclaim against Tifton for conversion of Commerce's collateral for its loans.

Mr. Dalton responded: "If Commerce Bank wants to sue Tifton for conversion, why step up, Your Honor."

 Notice to the attorney in this case was notice to the attorney's client. "The attorney-client relationship is one of agent-principal," and "the general rule is that notice to an agent while acting within the scope of his authority and with regard to any business over which his authority reaches, is notice to, or knowledge of the principal." *State v. Pinson*, 717 S.W.2d 266, 269 (Mo.Ct. App.1986); *see also Gold Medal Products, Inc. v. Love Enterprises, Inc.*, 766 S.W.2d 759, 764 (Mo.Ct.App.1989) (conversation between attorneys gave client knowledge of an assignment).

Mr. O'Neal made the remarks concerning revocation of consent just after the state court judge granted Tifton's motion to intervene in the trial between Commerce and Debtor. Therefore, Tifton's attorney was acting within the scope of his authority at this hearing while appearing on behalf of Tifton. Consequently, the statement by Commerce's attorney constitutes notice to Tifton.

Despite this notice, Tifton accepted payments totaling $819,055.19 from Debtor's Berryville account. Debtor opened that account in September 1992. Therefore, Tifton accepted all payments out of that account with full knowledge of Commerce's revocation of consent and in derogation of Commerce's right to possession of the proceeds. Accordingly, Tifton is liable to Commerce for converting the money it received from the Berryville Account.

### B. Unjust Enrichment

Tifton counterclaimed against Commerce for unjust enrichment, seeking to set off its

liability to Commerce for conversion of the collateral. Tifton argues that it supplied aluminum extrusions to Debtor that consequently increased the value of Commerce's collateral, thereby providing an unjust enrichment to Commerce.

■■■■ The essential elements of an unjust enrichment claim are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable." *Koepke Const., Inc. v. Woodsage Const., Co.,* 844 S.W.2d 508, 515 (Mo.Ct.App.1992); *Green Quarries, Inc. v. Raasch,* 676 S.W.2d 261, 264 (Mo.Ct.App.1984). The most significant of these elements is that retention of the benefit be unjust and unequitable. *Koepke,* 844 S.W.2d at 515; *Green Quarries,* 676 S.W.2d at 264.

There is a split of authority regarding the grounds on which an unsecured creditor can recover on an unjust enrichment claim against a secured creditor, thus altering the explicit priorities provided in Article 9. Very few cases have supported an unsecured creditor's recovery against a secured creditor for unjust enrichment. *See, e.g., Ninth Dist. Production Credit Ass'n v. Ed Duggan, Inc.,* 821 P.2d 788 (Colo.1991); *Borg-Warner Acceptance Corp. v. Valentine Associates Ltd., Corp.,* 192 Ga.App. 123, 384 S.E.2d 223 (1989).

Most courts support the view that a secured creditor's claim to collateral cannot be defeated by the equitable doctrine of unjust enrichment "absent truly egregious circumstances verging on actual fraud." *Peerless Packing Co. v. Malone & Hyde, Inc.,* 180 W.Va. 267, 376 S.E.2d 161, 164 n. 4 (1988). The court in *Peerless* emphasized that only "virtually fraudulent conduct" would justify such a claim in view of the strong policy for adherence to the priority system of the UCC. *Peerless,* 376 S.E.2d at 164. The *Peerless* court found no evidence of fraud that would justify supplanting UCC priorities with the application of the equitable doctrine of unjust enrichment. *Id.*

Tifton argues that this court should follow the rule articulated in *Duggan,* 821 P.2d 788 (Colo.1991). *Duggan* held that an unsecured creditor had a claim for unjust enrichment despite the fact that the secured creditor had not engaged in "virtual fraud." Rather, the *Duggan* court stated that "[w]here a secured creditor is benefitted by a transaction between its debtor and an unsecured creditor that enhances the value of the secured collateral, and the secured creditor initiates or encourages the transaction, the secured creditor can be held liable to the unsecured creditor on the theory of unjust enrichment." *Id.,* 821 P.2d at 801. The *Duggan* court reconciled its holding with that of *Peerless,* defining the central point of distinction as "the extent to which the secured creditor was involved in the transaction by which the unsecured creditor supplied goods or services that enhanced the value of the secured collateral." *Id.,* at 797.

■■■■ This court declines to follow the *Duggan* rule and adopts the stricter view articulated in *Peerless.* Applying this rule, Tifton's unjust enrichment claim fails because there is no evidence that Commerce acted fraudulently in its dealings with Debtor or Tifton. Even under the *Duggan* rule, Tifton's claim for unjust enrichment is without merit because Commerce did not encourage Tifton to supply aluminum extrusions after it demanded that Debtor turnover all assets. On the contrary, Commerce prohibited Debtor from purchasing any more supplies with the proceeds of the accounts receivable.

Tifton failed to protect itself with a purchase money security interest. Commerce discouraged the transactions that occurred between Debtor and Tifton. Further, Commerce did not engage in any activity that borders on fraud. Indeed, in light of Tifton's knowledge of Debtor's concealment of the accounts receivable proceeds in the Berryville account, Tifton does not seek equity with clean hands. Therefore, Tifton is not entitled to recover on its unjust enrichment claim for supplying aluminum extrusions to Debtor, which increased the value of Commerce's collateral. Any benefit that was con-

ferred upon Commerce was not unjust under the facts of this case.

In an apparent attempt to satisfy the strict dictates of the *Peerless* rule, Tifton further charges that Commerce attempted to settle the case while Debtor remained in possession of the collateral and that such attempts were somehow improper. There is nothing improper in discussing settlement during substantial litigation. Certainly, settlement negotiations do not constitute the type of conduct required under the *Peerless* doctrine for substitution of the unjust enrichment doctrine for statutory UCC priorities. Tifton's counterclaim for unjust enrichment is denied.

## V. APPLICATION OF PROCEEDS OF ACCOUNTS RECEIVABLE

On January 27, 1997, Commerce Bank, N.A., filed its Motion for Order Authorizing Application of Proceeds of Accounts Receivable, seeking to apply proceeds collected from the accounts receivable of Debtor Win-Vent, Inc. to the obligation owned by Debtor to Commerce. It is undisputed that Commerce has a duly perfected security interest in debtor's accounts receivable and in all proceeds of those accounts. Application of the proceeds shall be made only to the debt owed by Win-Vent to Commerce and does not constitute application of proceeds to or execution on the money judgment against Tifton, announced on the record at the conclusion of trial and entered as part of this final judgment.

## VI. CONCLUSION

Accordingly, it is ORDERED, AD-JUDGED and DECREED as follows on Plaintiff Commerce Bank's Motion for Summary Judgment and Defendant Tifton's Motion to Dismiss Counterclaim Without Prejudice:

1. Summary judgment is entered in favor of Commerce on Counts I, II, III and IV of Tifton's First Amended Counterclaim because there are no material facts in dispute on those counts and, therefore, Commerce is entitled to judgment as a matter of law.

2. Summary judgment is denied on Count V of defendant Tifton's Counterclaim. Count V remains set for trial.

3. Tifton Aluminum Company's Motion to Dismiss Without Prejudice all counts of its First Amended Counterclaim is DENIED.

4. This Order entering a partial summary judgment and denying defendant Tifton's Motion to Dismiss Without Prejudice its First Amended Counterclaim shall not be final for purposes of appeal until entry of the final order and judgment after trial of the remaining issues of this adversary action.

After trial of the remaining issues, it is further **ORDERED, ADJUDGED** and **DE-CREED** as follows:

5. Judgment is entered in favor of Commerce Bank, N.A. on count I of its First Amended Complaint, declaring that Commerce's interests in the collateral for its loans are superior to those of Tifton Aluminum Company, Inc. and Fred Charles Moon, Trustee of the Estate of Win-Vent, Inc.

6. The Motion of Commerce Bank, N.A., for Order Authorizing Application of Proceeds of Accounts Receivable is GRANTED and Commerce Bank may apply all proceeds collected from the accounts receivable of Debtor Win-Vent, Inc. to the principal balance of Debtor's obligation to Commerce. Commerce may not apply such proceeds to the interest on the principal balance and nothing in this order shall be construed as an application of proceeds to or execution on the money judgment against Tifton, announced on the record at the conclusion of trial and made part of this final judgment.

7. Judgment is entered in favor of Commerce Bank, N.A. and against Tifton Aluminum Company, Inc. and Fred Charles Moon, Trustee of the Estate of Win-Vent, Inc., on count II of its first amended complaint for conversion of collateral. Commerce shall recover $819,055.19 from Tifton on the conversion claim, together with post-judgment interest thereon at the rate provided in 28 U.S.C. § 1961(a).

8. Judgment is entered in favor of Commerce Bank, N.A. and against Tifton Aluminum Company, Inc., on count V of Tifton's counterclaim for unjust enrichment.

9. Costs shall be taxed against Tifton Aluminum Company, Inc.